POWER REACTOR DEVELOPMENT CO. *v.*
INTERNATIONAL UNION OF ELECTRI-
CAL, RADIO AND MACHINE
WORKERS, AFL–CIO, ᴇᴛ ᴀʟ.

No. 315.   Argued April 26–27, 1961.—Decided June 12, 1961.*

---

*Together with No. 454, *United States et al.* v. *International Union of Electrical, Radio and Machine Workers, AFL–CIO, et al.*, also on certiorari to the same Court.

*Solicitor General Cox* argued the cause for petitioners in No. 454. With him on the briefs were former *Solicitor General Rankin, Assistant Attorney General Orrick, Assistant Attorney General Doub, Daniel M. Friedman, Morton Hollander, Neil D. Naiden, Courts Oulahan* and *Lionel Kestenbaum.*

*W. Graham Claytor, Jr.* argued the cause for petitioner in No. 315. With him on the briefs were *John Lord O'Brian, David E. McGiffert, Edward S. Reid, Jr.* and *Richard B. Gushee.*

*Benjamin C. Sigal* argued the cause for respondents. With him on the brief were *Harold Cranefield* and *Lowell Goerlich.*

*R. M. Stroud* filed a brief for Adolph J. Ackerman, as *amicus curiae.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case is the first contested licensing proceeding to be decided by the Atomic Energy Commission under the Atomic Energy Act of 1954, 68 Stat. 919, 42 U. S. C. § 2011 *et seq.* It presents the question whether the Commission erred in continuing in effect a provisional construction permit which authorizes the petitioner Power Reactor Development Company to construct, but not to operate, a fast-neutron breeder reactor for the generation of electric power. The Court of Appeals for the District of Columbia Circuit set that order aside. 108 U. S. App. D. C. 97, 280 F. 2d 645 (1960). We granted certiorari, 364 U. S. 889 (1960), on petitions of the United States and of Power Reactor Development Company (hereafter PRDC), to decide an important question of the scope of the Commission's power under the Atomic Energy Act of 1954.

Stated more precisely, the question before us is whether the Commission, in issuing a permit for the construction of a facility which will utilize nuclear materials, such as the power reactor presently involved, must make the same definitive finding of safety of operation as it admittedly will have to make before it licenses actual operation of the facility. The Court of Appeals said: "It is undisputed that the Commission must make such a finding when it authorizes operation. The question is whether it must make such a finding when it authorizes construction. In our opinion it must." 108 U. S. App. D. C., at 100, 280 F. 2d, at 648. Petitioners agree that some finding directed to safety of operation must be made at the construction-permit stage of the proceeding, but argue that the Court of Appeals erred in holding that the Commission must have the same degree of certitude at this preliminary point as when it licenses operation. In order to understand how the controversy arises and what is involved in

its resolution, it will be necessary to state the proceedings in the case at some length, and then describe in detail the governing statute and administrative regulations. For the decision of this case ultimately turns on a comparison of what the Commission found with what the statute and regulations require.

The case began on January 7, 1956, when PRDC filed with the Commission (hereafter sometimes referred to as the AEC) an application to construct and operate a developmental power reactor of a relatively new type. This device has two characteristics which distinguish it from other nuclear reactors. First, the neutrons which fly about inside the reactor (to use crude but graphic layman's terminology) and split atoms of fissionable Uranium–235—thus releasing new neutrons and energy in the form of heat—are "fast" neutrons. That is, they travel at a velocity of about 10,000 miles per second, much faster than neutrons in ordinary reactors. Second, this reactor is a "breeder": it has the property of being able to produce about 1.2 times as much fissionable material as it consumes. This result comes about through a sort of modern alchemy; when the neutrons fly outside the inner core of the reactor, which is composed of fissionable U–235, they enter a blanket of nonfissionable U–238. Atoms in this blanket are changed, when struck by a neutron, into Plutonium, itself a fissionable fuel which can be removed from the reactor and be put to possible use in other installations. Thus, the reactor "breeds" Plutonium faster than it uses up U–235. It not only generates energy to produce electric power, it also creates new reactor fuel. This "breeder" effect is attainable because of the use of fast neutrons. Two boron control rods inserted into the reactor are a means designed to reduce its power level at any time. And in addition to these rods, eight more boron rods are suspended by an electromagnet over the reactor; in case the reactivity rises to a danger-

ously high level, these safety rods are intended to drop into the reactor automatically and shut it down immediately. The whole machine is housed in a series of thick concrete, graphite, and steel layers, all underground. Over this entire complex is placed a football-shaped building, enclosed in a two-inch steel shield capable of containing an explosion equal in force to 1,000 pounds of TNT, which is greater than any explosion which any of the experts who testified in this case believes is at all likely to result from an accident in the operation of the reactor. The application, after describing the reactor in much greater detail than this rudimentary summary, went on to provide that the reactor would be located at Lagoona Beach, Mich., on the shores of Lake Erie, about 35 miles from the center of Detroit, Mich., and about 30 miles from the center of Toledo, Ohio.

The Commission took the case under advisement and, on August 4, 1956, despite a report of its Advisory Committee on Reactor Safeguards which was at best noncommittal about the probable safety of the proposed reactor in operation, issued a provisional construction permit without having held public hearings, as the law at that time permitted it to do. This permit was subject to the following condition:

> "The conversion of this permit to a license is subject to submittal by PRDC to the Commission (by amendment of the application) of the complete, final Hazards Summary Report (portions of which may be submitted and evaluated from time to time). The final Hazards Summary Report must show that the final design provides reasonable assurance . . . that the health and safety of the public will not be endangered by operation of the reactor . . . ."

On August 31, 1956, in accordance with the Commission's then existing rules of practice, the respondents in

this Court, International Union of Electrical, Radio, and Machine Workers, United Automobile, Aircraft, and Agricultural Implement Workers of America, and United Papermakers and Paperworkers, petitioned the Commission for permission to intervene and oppose continuation in effect of PRDC's provisional construction permit. The AEC granted permission to intervene on October 8, 1956, and set the case down for a hearing before one of its hearing examiners. Extensive hearings were held between January 8, 1957, and August 7, 1957, and on November 22, 1957, in accordance with the AEC's order setting the case for hearing before him, the examiner, instead of issuing an initial decision and opinion of his own, transferred and certified the record of the hearings to the full Commission for its consideration. Oral argument was had before the Commission on May 29, 1958. On December 10, 1958, the Commission rendered its "Opinion and Initial Decision" continuing PRDC's permit in effect, subject to the same condition recited above. To its opinion were appended extensive findings of fact, including Finding 22, which is of central importance to the decision of this case. That finding reads as follows:

"22. The Commission finds reasonable assurance in the record that a utilization facility of the general type proposed in the PRDC application and amendments thereto can be constructed and will be able to be operated at the location proposed without undue risk to the health and safety of the public."

Commissioners Vance and Floberg joined in the opinion. Commissioner Graham filed a short concurring opinion agreeing with the Commission's basic safety findings, just quoted, but doing so in much shorter compass than the majority. Commissioners Libby and McCone (the chairman) took no part in the decision. The result of this initial opinion was an order continuing PRDC's provi-

sional construction permit in effect, but containing the same condition which the original permit, issued on August 4, 1956, had contained.

The intervening unions, as was their right, filed detailed exceptions to this initial decision. The Commission fully reconsidered all the contentions and reviewed the evidence presented at the lengthy hearings, with particular attention to the testimony of the scientific experts, several of them members of the Advisory Committee on Reactor Safeguards, who had testified. On May 26, 1959, the Commission issued its "Opinion and Final Decision," dealing with all questions presented in even greater detail and reaffirming its initial decision. The Commission emphasized that "public safety is the first, last, and a permanent consideration in any decision on the issuance of a construction permit or a license to operate a nuclear facility." Even after operation of the reactor is licensed—if it ever is—the Commission, it said, will retain jurisdiction over PRDC's activities to ensure that the highest safety standards are maintained. The opinion went on to examine the suitability of the proposed site, noted that it was near a great population center, and nevertheless concluded that at the present stage there was reasonable assurance that the general type of reactor proposed by PRDC would be safe enough at that location. The Commission pointed out, however, that its action in allowing PRDC to proceed with construction was by its nature tentative and preliminary, and that it was by no means committed to the issuance of an operating license. "PRDC has been on notice since before the first shovel of dirt was moved," it said, "that its construction permit is *provisional* upon further demonstration of many technological and financial facts, including the complete safety of the reactor." A more severe safety test would have to be passed when the reactor was completed, the opinion said, since "[t]he degree of 'reasonable assurance' . . .

that satisfies us . . . for purposes of the *provisional* construction permit would not be the same as we would require in considering the issuance of the *operating* license." The Commission then made new findings of fact, including the following counterpart of its initial Finding 22:

"22. The Commission finds reasonable assurance in the record, for the purposes of this provisional construction permit, that a utilization facility of the general type proposed in the PRDC Application and amendments thereto can be constructed and operated at the location without undue risk to the health and safety of the public."

All three of the Commissioners who took part in the case joined in this final decision, and the Commission entered its final order continuing in effect the PRDC provisional construction permit, but again subject to the condition that a more extensive safety investigation, and a definitive safety finding, would have to be made before operation was permitted.

The intervening unions, respondents in this Court, then petitioned the Court of Appeals for the District of Columbia Circuit to review and set aside this order of the Commission. Only the final order continuing the permit in effect was drawn in question. No complaint was made of the original *ex parte* grant of the permit in 1956. PRDC intervened in the Court of Appeals in support of the AEC. On June 10, 1960, by a divided vote, a three-judge panel of the Court of Appeals set aside the AEC's order and remanded the case to the Commission. A petition for rehearing *en banc* was denied, two judges dissenting, and we brought the case here.

We turn now to an examination of the statutes and regulations pursuant to which the Commission purported to continue in effect PRDC's construction permit. The

basic provision is § 104b of the Atomic Energy Act of 1954, 42 U. S. C. § 2134 (b), which authorizes the AEC to "issue licenses to persons applying therefor for utilization and production facilities involved in the conduct of research and development activities . . . . In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its obligations under this chapter to promote the common defense and security and to protect the health and safety of the public . . . ." Two things about this section should be emphasized. First, there is no doubt that the term "licenses" as used therein includes the provisional construction permit which PRDC has received. The last sentence of § 185, 42 U. S. C. § 2235, expressly so provides, as we shall soon see. And second, there is also no doubt that construction permits, like all other licenses, can be issued only consistently with the health and safety of the public. But the responsibility for safeguarding that health and safety belongs under the statute to the Commission. And § 104b, especially when read in connection with the general rule-making power conferred by § 161i (3), 42 U. S. C. § 2201 (i) (3), clearly contemplates that the Commission shall by regulation set forth what the public safety requires as a prerequisite to the issuance of any license or permit under the Act.

The issuance of construction permits is subject to § 185, 42 U. S. C. § 2235. That section provides that

"All applicants for licenses to construct or modify production or utilization facilities shall, if the application is otherwise acceptable to the Commission, be initially granted a construction permit. The construction permit shall state the earliest and latest dates for the completion of the construction or modification. Unless the construction or modification of the facility is completed by the completion date, the

construction permit shall expire, and all rights thereunder be forfeited, unless upon good cause shown, the Commission extends the completion date. Upon the completion of the construction or modification of the facility, upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commisson, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this chapter, the Commission shall thereupon issue a license to the applicant. For all other purposes of this chapter, a construction permit is deemed to be a 'license.' "

It is clear from the face of this statute—and all parties agree—that Congress contemplated a step-by-step procedure. First an applicant would have to get a construction permit, then he would have to construct his facility, and then he would have to ask the Commission to grant him a license to operate the facility. This procedure is described in its general outlines in Marks and Trowbridge, Framework for Atomic Industry, 76–77 (1955). See also Green, The Law of Reactor Safety, 12 Vand. L. Rev. 112, 121–127 (1958). The second step of the procedure, the application for and granting of an operating license, is governed by § 182a, 42 U. S. C. § 2232 (a). That provision reads, in pertinent part:

"In connection with applications for licenses to operate production or utilization facilities, the applicant shall state such technical specifications . . . and such other information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special

> nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public."

It is clear from this provision that before licensing the operation of PRDC's reactor, the AEC will have to make a positive finding that operation of the facility will "provide adequate protection to the health and safety of the public." What is not clear, and what is at the center of the controversy in this case, is whether the Commission must also have made such a finding when it issued PRDC's construction permit. There is nothing on the face of either § 182 or § 185 which tells us what safety findings must be made before this preliminary step is taken. We know, however, from § 104b that some such finding must be made. For enlightenment on the nature of this finding, both parties urge us to examine the Commission's regulations, and accordingly we proceed to do so.

The crucial regulation for our purposes is the Commission's regulation 50.35, 10 CFR § 50.35:

> "§ 50.35. *Extended time for providing technical information.* Where, because of the nature of a proposed project, an applicant is not in a position to supply initially all of the technical information otherwise required to complete the application, he shall indicate the reason, the items or kinds of information omitted, and the approximate times when such data will be produced. If the Commission is satisfied that it has information sufficient to provide reasonable assurance that a facility of the general type proposed can be constructed and operated at the proposed location without undue risk to the health and safety of the public and that the omitted information will be supplied, it may process the application and issue a construction permit on a provisional basis without the omitted information subject

to its later production and an evaluation by the Commission that the final design provides reasonable assurance that the health and safety of the public will not be endangered."

This regulation, obviously, elaborates upon and describes in fuller detail the step-by-step licensing procedure contemplated by §§ 182 and 185. It states, pursuant to the authority conferred by §§ 104b and 161i (3), what safety findings shall be required at each stage of the proceeding. There is general agreement that the second safety finding referred to, "that the final design provides reasonable assurance that the health and safety of the public will not be endangered," comports with the requirements of § 182 concerning the issuance of a license to operate. There is also agreement that the regulation's first required safety finding, "that [the AEC] has information sufficient to provide reasonable assurance that a facility of the general type proposed can be constructed and operated at the proposed location without undue risk to the health and safety of the public," is a valid exercise of the rule-making power conferred upon the AEC by statute, and requires that some finding as to safety of operation be made even before a provisional construction permit is granted. The question is whether that first finding must be backed up with as much conviction as to the safety of the final design of the specific reactor in operation as the second, final finding must be.

We think the great weight of the argument supports the position taken by PRDC and by the Commission, that Reg. 50.35 permits the Commission to defer a definitive safety finding until operation is actually licensed. The words of the regulation themselves certainly lean strongly in that direction. The first finding is to be made, by definition, on the basis of incomplete information, and concerns only the "general type" of reactor proposed.

The second finding is phrased unequivocally in terms of "reasonable assurance," while the first speaks more tentatively of "information sufficient to provide reasonable assurance." The Commission, furthermore, had good reason to make this distinction. For nuclear reactors are fast-developing and fast-changing. What is up to date now may not, probably will not, be as acceptable tomorrow. Problems which seem insuperable now may be solved tomorrow, perhaps in the very process of construction itself. We see no reason why we should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co. v. United States*, 288 U. S. 294, 315 (1933). And finally, and perhaps demanding particular weight, this constructtion has time and again been brought to the attention of the Joint Committee of Congress on Atomic Energy, which under § 202 of the Act, 42 U. S. C. § 2252, has a special duty during each session of Congress to "conduct hearings in either open or executive session for the purpose of receiving information concerning the development, growth, and state of the atomic energy industry," and to oversee the operations of the AEC. See, *e. g.*, Hearings on Development, Growth, and State of the Atomic Energy Industry, 84th Cong., 2d Sess., p. 106 (1956); Hearings on Development, etc., 85th Cong., 2d Sess., pp. 119–121 (1958); Hearings on Development, etc., 86th Cong., 2d Sess., pp. 103–109, 677–678 (1960); Hearings on Development, etc., 87th Cong., 1st Sess., pp. 29–32 (1961); Hearings on

Governmental Indemnity for Private Licensees and AEC Contractors Against Reactor Hazards, 84th Cong., 2d Sess., pp. 62–65 (1956); A Study of AEC Procedures and Organization in the Licensing of Reactor Facilities, 85th Cong., 1st Sess., pp. 11–14, 100–108 (Joint Comm. Print 1957). No change in this procedure has ever been suggested by the Committee, although it has on occasion been critical of other aspects of the PRDC proceedings not before us. It may often be shaky business to attribute significance to the inaction of Congress, but under these circumstances, and considering especially the peculiar responsibility and place of the Joint Committee on Atomic Energy in the statutory scheme, we think it fair to read this history as a *de facto* acquiescence in and ratification of the Commission's licensing procedure by Congress. Cf., *e. g., Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 292–294 (1958); *Brooks* v. *Dewar,* 313 U. S. 354, 360–361 (1941). This same procedure has been used in each of the nine instances in which the Commission has granted a provisional construction permit for a developmental nuclear power reactor, *e. g., Yankee Atomic Elec. Co.,* CPPR–5 (AEC 1957), and we hold that it was properly used in this case.

It is plain that the statute and regulations, as so construed and applied, were complied with fully. The Commission did not, as respondents' argument seems at times to suggest, find merely that the construction of the reactor would present no safety problem. The Commission's opinion and findings clearly were deeply concerned about the prospective safety of operation of the proposed reactor. Admitting that on the basis of the facts before it it was unable to make a definitive finding of safety, the Commission nevertheless found—and respondents do not deny that the finding was supported by substantial evidence—that it had information sufficient to provide

reasonable assurance that the general type of reactor proposed could be operated without undue risk to the health and safety of the public. Its Finding 22, which we have quoted, was in the very words of Reg. 50.35, except for the insertion of the phrase, "for the purposes of this provisional construction permit." This phrase was merely declaratory of the nature of the proceeding before the Commission, and in no way denigrated the finding as to safety of operation.

Respondents contend nevertheless that their construction of the statute is compelled by the legislative history. Since the Court of Appeals relied heavily on this history, we have studied it carefully. Two incidents are cited in particular. First, the Joint Committee stated in its report on the bill which became the Atomic Energy Act of 1954, and which when reported contained §§ 182 and 185 in substantially their present shape, that "[s]ection 185 . . . requires the issuance of a license if the construction is carried out in accordance with the terms of the construction permit." S. Rep. No. 1699, 83d Cong., 2d Sess., p. 28 (1954); H. R. Rep. No. 2181, 83d Cong., 2d Sess., p. 28 (1954). The best we can say about this statement, with all deference, is that it must have been inadvertent. Witnesses who appeared before the Joint Committee at the hearings on the bill had made the very complaint that under the words of the bill as proposed a company might invest large sums in construction of a reactor, and then be denied the right to operate it. This situation, they claimed, was unfair, and would substantially discourage the private investment in the field of atomic power which it was one of the bill's major purposes to stimulate. See Hearings before the Joint Committee on Atomic Energy on the Bill to Amend the Atomic Energy Act of 1946, 83d Cong., 2d Sess., Pt. I., pp. 113, 119 (statement of Paul W. McQuillen, representing

the Dow Chemical-Detroit Edison and Associates atomic
power development project, predecessors of PRDC); pp.
226–227 (statement of E. H. Dixon, chairman of the
Committee on Atomic Power of the Edison Electric Insti-
tute and president of Middle-South Utilities, Inc.); p. 417
(statement of the Special Committee on Atomic Energy
of the Association of the Bar of the City of New York).
In spite of these pleas, however, the bill was unchanged.
Industry spokesmen renewed the argument the next year
when they sought unsuccessfully to have § 185 amended.
Hearings on Development, etc., 84th Cong., 1st Sess., pp.
258, 261 (1955). Even a glance at § 185 suffices to show
that issuance of a construction permit does not make
automatic the later issuance of a license to operate. For
that section sets forth three conditions, in addition to
the completion of the construction, which must be met
before an operating license is granted: (1) filing of any
additional information necessary to bring the application
up to date—information which will necessarily in this
case include detailed safety data concerning the final
design of petitioner's reactor; (2) a finding that the
reactor will operate in accordance with the act and regu-
lations—*i. e.*, that the safety and health of the public will
be adequately protected—and with the construction per-
mit itself, which is expressly conditioned upon a full inves-
tigation and finding of safety before operation is per-
mitted; and (3) the absence of any good cause why the
granting of a license to operate would not be in accordance
with the Act—*e. g.*, a showing by respondent unions,
who will have full rights to appear and contest the issu-
ance of an operating license, that the reactor may not be
reasonably safe.

Respondents rely more heavily on another event dur-
ing the debates on this bill on the floor of the Senate.
Senator Humphrey, an opponent of the bill, expressed a

desire that it be made clear that "the construction permit is equivalent to a license," and that "the revised section 182 on license application . . . appl[ies] directly to construction permits." 100 Cong. Rec. 12014 (July 26, 1954). Senator Hickenlooper, floor manager of the bill and the ranking Senate member of the Joint Committee on Atomic Energy, indicated that he agreed with this construction of §§ 182 and 185. Senator Humphrey wanted these matters made clear because he feared that otherwise a construction permit could be easily obtained and substantial investment made in construction, and then the Commission would feel obliged, perhaps under pressure, to issue an operating license in order that this investment should not go to waste. The language used in the exchange between Senators Humphrey and Hickenlooper is susceptible, if read broadly and out of context, of the construction which respondents attribute to it, namely, that no § 185 construction permit may be issued unless the Commission has made the same safety-of-operation finding which it must make under § 182a before allowing actual operation. But the context of the exchange makes it clear that no such implication was intended by the participants. Senator Humphrey's statements were made during the consideration of an amendment which he had himself proposed on July 16. This amendment would have added the following clause to the end of § 185:

"and no construction permit shall be issued by the Commission until after the completion of the procedures established by section 182 for the consideration of applications for licenses under this act."

Upon being assured by Senator Hickenlooper that an earlier amendment which Senator Hickenlooper himself had offered to § 189 took care of the problem, Senator Humphrey withdrew his proposal. This amendment to

§ 189, which was adopted, was concerned solely with hearings and judicial review. Plainly Senator Humphrey's concern was not with the substantive safety findings necessary to the issuance of a construction permit, but rather with the procedural safeguards with which that issuance should, in his opinion, be surrounded. The reference to the application of § 182 to construction permits was made not with § 182a in mind—that subsection sets out the substantive safety standard for the issuance of an operating license—but rather with a view to the application of § 182b, about which Senator Humphrey particularly asked Senator Hickenlooper during the exchange on the floor referred to, and which merely provides that notice of a license application must be published and given to any appropriate regulatory agencies, a procedural requirement which was fully satisfied in this case. This interpretation of the meaning of Senator Humphrey's remarks is borne out by a statement of Representative Holifield, who, together with Representative Price, had dissented from the favorable report of the Joint Committee, precisely because, *inter alia,* under the bill as reported a construction permit did not have to be preceded by the same *procedures* as an operating license. See S. Rep. No. 1699, 83d Cong., 2d Sess., p. 123 (1954); H. R. Rep. No. 2181, 83d Cong., 2d Sess., p. 123 (1954). Representative Price wanted the same amendment added to § 185 which Senator Humphrey proposed, and he characterized this amendment as necessary to ensure "that the same procedural safeguards in the case of licenses be applied to construction permits." 100 Cong. Rec. 10959 (July 19, 1954). We think, therefore, that Senator Humphrey's statement referred only to procedural prerequisites of construction permits, and had nothing to do with the substantive safety considerations which this case involves. If there were any doubt about this matter, the

consistent administrative practice, made known to Congress many times and never disturbed by it, would dictate this conclusion.

The Court of Appeals put forward as an alternative basis for its decision the holding that under the law the Commission may not authorize the construction of a reactor near a large population center without "compelling reasons" for doing so, 108 U. S. App. D. C., at 103–104, 280 F. 2d, at 651–652, and that no such reasons had been found by the AEC in this case. It is not clear whether respondents have abandoned that contention in this Court, and it is likewise uncertain whether they ever presented it to the Commission, a step which would ordinarily be a prerequisite to its consideration by the Court of Appeals. In any event, the position is without merit. The statute and regulations say nothing about "compelling reasons." Of course Congress (and the Commission, too, for that matter) had the problem of safety uppermost in mind, and of course that problem is most acute when a reactor, potentially dangerous, is located near a large city. But the Commission found reasonable assurance, for present purposes, that the reactor could be safely operated at the proposed location, and that is enough to satisfy the requirements of law. The Commission recognized that the site and all its properties are among the most important ingredients of a finding of safety *vel non*. It considered the site along with all the other relevant data. There is no warrant in the statute for setting aside the Commission's conclusion.

We hold, therefore, that the Court of Appeals erred in setting aside the order of the AEC continuing PRDC's provisional construction permit in effect. We deem it appropriate to add a few words concerning the fears of nuclear disaster which respondents so urgently place before us. The respondents' argument is tantamount to

an insistence that the Commission cannot be counted on, when the time comes to make a definitive safety finding, wholly to exclude the consideration that PRDC will have made an enormous investment. The petitioners concede that the Commission is absolutely denied any authority to consider this investment when acting upon an application for a license for operation. PRDC has been on notice long since that it proceeds with construction at its own risk, and that all its funds may go for naught. With its eyes open, PRDC has willingly accepted that risk, however great. No license to operate may be issued to PRDC until a full hazards report has been filed, until the AEC's Advisory Committee on Reactor Safeguards makes a full investigation and public report on safety to the Commission, until the Commission itself, after notice and hearings at which respondents, if they desire, may be heard, has made the safety-of-operation finding required by § 182a and Reg. 50.35, and until the other requirements of § 185 have been met. It may be that an operating license will never be issued. If one is, that will not be the end of the matter. The respondents may have judicial review. Moreover, the Commission's responsibility for supervision of PRDC continues. For, under Reg. 50.57, 10 CFR § 50.57, operation at full power (100,000 electric kilowatts) will not be permitted until several steps of gradually increasing operation have been successfully mastered, with a full public hearing at each step, and no further advance permitted without the AEC's being fully satisfied that a step-up will meet the high safety standards imposed by law. This is the multi-step scheme which Congress and the Commission have devised to protect the public health and safety. We hold that the actions of the Commission up to now have been within the Congressional authorization. We cannot assume that the Commission will exceed its powers, or that these

many safeguards to protect the public interest will not be fully effective.

Accordingly, the judgment is reversed and the causes are remanded to the Court of Appeals for further proceedings consistent with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

The only requirement in the Act for a finding that the facilities involved here "will provide adequate protection to the health and safety of the public" is found in § 182 which is headed "License Applications."[1] By the terms of § 185 a construction permit is, apart from the requirements of § 185, "deemed to be a 'license.' "[2] Section 185 governs applications for construction permits. It has no separate or independent standards for safety, no specific requirement for a finding on "safety." If the facility is finished and will operate "in conformity with" the Act, the license issues "in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of" the Act. As the Committee Report stated, "Section 185 . . . *requires* the issuance of a license if the construction is carried out in accordance with the terms of the construction permit."[3] In other words, the finding on "safety," if it is to be made (as it assuredly must be), must be made at the time the construction permit is issued or not at all.

While in the present case the Commission "finds reasonable assurance in the record, for the purposes of this provisional construction permit," that the facility can be operated "without undue risk to the health and safety of

---

[1] See Appendix to this opinion, *post,* p. 419.

[2] *Ibid.*

[3] 1 Leg. Hist. 1024. (Emphasis added.)

the public," it also finds that "It has not been positively established" that a facility of this character "can be *operated* without a credible possibility of releasing significant quantities of fission products to the environment." The Commission added that there was "reasonable assurance" before the date when the facility went into operation that research and investigation would definitely establish "whether or not the reactor proposed by Applicant can be so operated."

Plainly these are not findings that the "safety" standards have been met. They presuppose—contrary to the premise of the Act—that "safety" findings can be made *after construction is finished.* But when that point is reached, when millions have been invested, the momentum is on the side of the applicant, not on the side of the public. The momentum is not only generated by the desire to salvage an investment. No agency wants to be the architect of a "white elephant." Congress could design an Act that would give a completed structure that momentum. But it is clear to me it did not do so.

When this measure was before the Senate, Senator Humphrey proposed an amendment that read, "no construction permits shall be issued by the Commission until after the completion of the procedures established by section 182 for the consideration of applications for licenses under this act." [4] That amendment would plainly have made the present findings inadequate, for they leave the issue of "safety" wholly in conjecturé and unresolved.

Senator Humphrey explained his amendment as follows: [5]

> "The purpose of the amendment when it was prepared was to make sure that the construction of a facility was not permitted prior to the authorization

[4] 3 Leg. Hist. 3759.

[5] *Ibid.*

of a license, because had that been done what it would have amounted to would be getting an investment of a substantial amount of capital, which surely would have been prejudicial in terms of the Commission issuing the license. In other words, if the Commission had granted the construction permit for some form of nuclear reactor, and then the question of a license was not fully resolved, surely there would have been considerable pressure, and justifiably so, for the Commission to have authorized the license once it had authorized the permit for construction.

"The chairman of the committee tells me he has modified certain sections by the committee amendments to the bill, of which at that time I was not aware. The chairman indicates to me that under the terms of the bill, as amended, the construction permit is equivalent to a license. In other words, as I understand, under the bill a construction permit cannot be interpreted in any other way than being equal to or a part of the licensing procedure. Is that correct?"

His question was answered by Senator Hickenlooper, who was in charge of the bill: [6]

"A license and a construction permit are equivalent. They are the same thing, and one cannot operate until the other is granted.

"The same is true with reference to hearings. Therefore, we believe, and we assure the Senator, that the amendment is not essential to the problem which he is attempting to reach."

Senator Humphrey then asked if § 182 applied "directly to construction permits." [7]  Senator Hickenlooper

[6] *Ibid.*
[7] *Ibid.*

replied "Yes." [8]   Senator Humphrey accordingly withdrew his amendment.[9]

This legislative history makes clear that the time when the issue of "safety" must be resolved is before the Commission issues a construction permit.   The construction given the Act by the Commission (and today approved) is, with all deference, a light-hearted approach to the most awesome, the most deadly, the most dangerous process that man has ever conceived.[10]

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS.

Section 182a provides in relevant part:

"LICENSE APPLICATIONS.—

"a. Each application for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary to decide such of the technical and financial qualifications of the applicant, the character of the applicant, the citizenship of the applicant, or any other qualifications of the applicant as the Commission may deem appropriate for the license.   In connection with applications for licenses to operate production or utilization facilities, the applicant shall state such technical specifications, including information of the amount, kind,

---

[8] *Ibid.*

[9] *Ibid.*

[10] See Biological and Environmental Effects of Nuclear War, Summary-Analysis of Hearings, June 22–26, 1959, Joint Committee on Atomic Energy, 86th Cong., 1st Sess.; Fallout From Nuclear Weapons Tests, Summary-Analysis of Hearings, May 5–8, 1959, Joint Committee on Atomic Energy, 86th Cong., 1st Sess.   For an analysis of the administrative law techniques used by the Commission in this case, see Jalet, A Study in Administrative Law, 47 Georgetown L. J. 47 (1958).

and source of special nuclear material required, the place of the use, the specific characteristics of the facility, and such other information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public. Such technical specifications shall be a part of any license issued."

Section 185 provides:

"CONSTRUCTION PERMITS.—All applicants for licenses to construct or modify production or utilization facilities shall, if the application is otherwise acceptable to the Commission, be initially granted a construction permit. The construction permit shall state the earliest and latest dates for the completion of the construction or modification. Unless the construction or modification of the facility is completed by the completion date, the construction permit shall expire, and all rights thereunder be forfeited, unless upon good cause shown, the Commission extends the completion date. Upon the completion of the construction or modification of the facility, upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this Act and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this Act, the Commission shall thereupon issue a license to the applicant. For all other purposes of this Act, a construction permit is deemed to be a 'license.' "