No. 73–1315. MORNINGSIDE RENEWAL COUNCIL, INC., ET AL. *v.* UNITED STATES ATOMIC ENERGY COMMISSION ET AL. C. A. 2d Cir. Certiorari denied. 

MR. JUSTICE DOUGLAS, dissenting.

The Atomic Energy Commission's Safety and Licensing Appeal Board, reversing the decision of the Atomic Safety and Licensing Board, granted respondent Columbia University authorization to operate a Triga Mark II nuclear reactor on the university campus in Manhattan. Petitioners, who had intervened in the proceedings before the Commission, then brought a petition for review in the Court of Appeals. That court denied the petition and sustained the granting of the license in a split decision. 482 F. 2d 234. Petitioners claim that the Commission's failure to establish safety standards through rulemaking procedures requires reversal. They also contend that the agency's determination that no environmental impact statement was necessary* should be reversed under the proper standard of appellate review.

The Safety and Licensing Board had denied the license because it would not answer the questions raised about the reactor's possible effect on public health and safety without the benefit of general accident safety standards applicable to Triga reactors, but the Commission has never promulgated any such standards. Rather than proceeding through this rulemaking route the Commission has adjudicated safety questions on an individual, *ad hoc* basis, and the Commission's own licensing board found this procedure unsatisfactory:

> "The absence of applicable substantive criteria of the Commission and of convincing objective stand-

---

*An impact statement is required whenever there is a "major Federal action significantly affecting the quality of the human environment." 42 U. S. C. § 4332 (2) (C).

ards of the regulatory staff . . . prompts the Licensing Board to decline answering the question of whether the health and safety of the public would be endangered upon the occurrence of a postulated accident to the applicant's reactor. The Licensing Board considers it inappropriate to enforce an answer derived from the narrow confines of a single proceeding and its own personal views about the degree to which the health and safety of the public ought to be protected against accident consequences."

The seeds of the present controversy were laid in *Power Reactor* v. *Electricians*, 367 U. S. 396, where we reversed a Court of Appeals holding that the Commission may not authorize the construction of a reactor near a large population center without "compelling reasons" for doing so, *id.*, at 414. There the Commission, "despite a report of its Advisory Committee on Reactor Safeguards, which was at best noncommittal about the probable safety of the proposed reactor in operation, issued a provisional construction permit without having held public hearings . . . ," *id.*, at 400, but our holding allowed the construction of the reactor to go forward. After the reactor was constructed and went into operation, an accident occurred on October 5, 1966. The reactor was shut down and has never been in regular operation since; it is currently being decommissioned. *In re Power Reactor Development Co.*, No. 50–16, Jan. 16, 1973 (Atomic Safety and Licensing Board); letter from Harold L. Price, Director of Regulation, to Sen. Philip A. Hart, Aug. 13, 1970.

Our decision in *Power Reactor* allowed construction to go forward with the principal inquiry into safety deferred until a subsequent application for a license to operate. "But when that point is reached, when millions have been invested, the momentum is on the side

of the applicant, not on the side of the public. The momentum is not only generated by the desire to salvage an investment. No agency wants to be the architect of a 'white elephant.'" *Power Reactor, supra,* at 417 (DOUGLAS, J., dissenting).

In regard to nuclear power generating plants, in fact, "conversion from construction permit to operating license has been automatic," Bronstein, The AEC Decision-Making Process and the Environment: a Case Study of the Calvert Cliffs Nuclear Power Plant, 1 Ecology L. Q. 689, 702 (1971). This may well be the problem lurking in the background here, as these petitioners were not on the scene to contest the issuance of the original construction permit for this reactor in 1963, and no judicial review was sought at that time. And in any event intervenors seeking to represent the public interest in an AEC construction permit contest have found themselves confronted with a "no-win" situation, in part because of "the fear or reluctance of qualified scientists and technicians to testify against a project recommended by the AEC." Like, Multi-Media Confrontation—The Environmentalists' Strategy for a "No-Win" Agency Proceeding, 1 Ecology L. Q. 495, 502 (1971).

This only goes to highlight the need here for the Commission to develop the relevant safety standards before passing on this application to authorize operation of a reactor in the midst of the Nation's largest metropolis.

The benefits of a rulemaking proceeding are clear; they give notice to affected persons and allow them to be heard, and the result is that "[a]gencies discover that they are not always repositories of ultimate wisdom; they learn from the suggestions of outsiders and often benefit from that advice." *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759, 777–778 (DOUGLAS, J., dissenting).

The need would seem particularly great here because of the Commission's dual role as regulator and promoter of atomic energy. As Judge Oakes, dissenting below, pointed out: "The AEC . . . has an interest in seeing this reactor licensed to promote its Nuclear Education Training Program; to this end it has entered into an agreement with Columbia to provide post-license funds for the operation of the reactor and to waive charges for Commission-owned special nuclear material involved in its operation. My concern is so much the greater where, as here, the independent Safety and Licensing Board has denied the license, but was overruled by the three-member Appeal Board, consisting of two AEC staff members. Moreover, the safety tests relied upon by the Appeal Board here were conducted by the most interested party, the manufacturer of the reactor, following an exchange of correspondence between 'Ralph' (Mr. Peters of Gulf Oil) and 'Pete' (Dr. Peter A. Morris, Director of the AEC Division of Reactor Licensing) in which Gulf advised the Commission that 'We hope to have you or members of your staff participate fully in these experiments so that they will be deemed to have been done "under the auspices of the Regulatory Staff." ' " 482 F. 2d, at 241.

For the same reasons it seems necessary to look more closely at the Commission's determination that no environmental impact statement need be prepared than did the court below, which was content to conclude that the agency's determination was not "arbitrary or capricious." Indeed there appears to be a conflict between the standard employed here by the Second Circuit and that employed by the Fifth Circuit in such cases as *Save Our Ten Acres* v. *Kreger,* 472 F. 2d 463, and *Hiram Clarke Civic Club, Inc.* v. *Lynn,* 476 F. 2d 421; the Fifth Circuit applies a more stringent standard of "reasonableness."

I would grant the petition for certiorari, both to resolve this conflict and to consider the propriety of the agency's

practice of licensing Triga reactors in the absence of rules establishing safety standards.