DELTA AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

No. 80–2339.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1981.

Decided Feb. 26, 1982.

Robert Reed Gray, Washington, D. C., with whom Louis H. Kurrelmeyer, Benjamin A. Achenbach, Jr., Washington, D. C., James W. Callison and Don M. Adams, Atlanta, Ga., were on the brief, for petitioner.

Thomas L. Ray, Atty., Civil Aeronautics Board, Washington, D. C., with whom Michael Schopf, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Civil Aeronautics Board, Robert B. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Before BAZELON, Senior Circuit Judge, and WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

To implement the "Small Community Air Service" provisions of the Airline Deregulation Act of 1978 (hereinafter referred to as the Deregulation Act),[1] the Civil Aeronautics Board (CAB) instituted the Essential Air Service Program. The Program was designed to implement those provisions of the Act that ensured "essential air transportation"[2] for qualifying communities. The issue in this case is whether the Act authorizes the inclusion of Montgomery, Alabama in that Program.[3] We hold that it does not.

## I. FACTUAL BACKGROUND

On February 22, 1980, Montgomery was receiving air carrier service from Eastern Air Lines (Eastern), Delta Air Lines (Delta), and Republic Air Lines (Republic).[4] On

---

1. Pub.L. No. 95–504, 92 Stat. 1705 (codified at 49 U.S.C. § 1301 et seq. (Supp. III 1979)).

2. Airline Deregulation Act of 1978, Section 419(f), 49 U.S.C. § 1389(f) (Supp. III 1979) [hereinafter citations to section numbers refer to sections of the Federal Aviation Act as amended by the Deregulation Act].

3. The legal issues raised in this case are ones of first impression. In *New Haven v. CAB*, 618 F.2d 955 (2d Cir. 1980), *Frontier Airlines v. CAB*, 621 F.2d 369 (10th Cir. 1980), and *Kern v. CAB*, 633 F.2d 856 (9th Cir. 1980), the courts have addressed provisions of the Deregulation Act that are similar to those at issue in this case. Those cases, however, have no bearing on this case.

4. Montgomery received the following service seven days per week:

*From Delta:*

| Flight Number | Number of Seats | Complete Routing |
|---|---|---|
| DL-124 | 137 | *Montgomery*-Atlanta |
| DL-642 | 137 | Houston-Shreveport-Jackson-*Montgomery*-Atlanta-LaGuardia (NYC) |
| DL-858 | 88 | *Montgomery*-Atlanta |
| DL-140 | 137 | Los Angeles-Dallas/Ft. Worth-Jackson-*Montgomery*-Atlanta-Charlotte |
| DL-1776 | 88 | *Montgomery*-Atlanta |
| DL-289 | 137 | Atlanta-*Montgomery* |
| DL-620 | 137 | LaGuardia (NYC)-Atlanta-*Montgomery*-Jackson-Memphis-Chicago |
| DL-757 | 88 | Columbus (Ohio)-Atlanta-*Montgomery* |
| DL-827 | 88 | Charlotte-Atlanta-*Montgomery*-Jackson-Dallas/Ft. Worth |
| DL-1747 | 88 | Atlanta-*Montgomery* |

*From Republic:*

| Flight Number | Number of Seats | Complete Routing |
|---|---|---|
| RC-211 | 80-85 | Chicago-Memphis-*Montgomery*-Tallahassee-Miami |
| RC-218 | 80-85 | Miami-Orlando-*Montgomery*-Birmingham-Memphis-St. Louis |
| RC-226 | 80-85 | Miami-Tallahassee-*Montgomery*-Memphis-Chicago-Grand Rapids |
| RC-229 | 80-85 | St. Louis-Memphis-Birmingham-*Montgomery*-Orlando-Miami |

*From Eastern:*

| Flight Number | Number of Seats | Complete Routing |
|---|---|---|
| EA-441 | 93 | Atlanta-*Montgomery* |
| EA-777 | 93 | Milwaukee-Atlanta-*Montgomery* |
| EA-653 | 93 | Newark-Washington-Raleigh/Durham-Columbia-Atlanta-*Montgomery*-Pensacola |
| EA-122 | 93 | *Montgomery*-Atlanta-Philadelphia |
| EA-508 | 93 | Pensacola-*Montgomery*-Atlanta-Norfolk |
| EA-266 | 93 | *Montgomery*-Atlanta-Indianapolis |

that date, Eastern notified the CAB and the City of Montgomery that it intended to suspend indefinitely all service to and from Montgomery.[5] The suspension was to begin on June 1, 1980, at the earliest. The City of Montgomery, the Montgomery Airport Authority, and the Montgomery Area Chamber of Commerce objected to the suspension and petitioned the CAB to prevent Eastern from carrying out its plan.[6] The CAB responded by ordering Eastern to maintain one daily roundtrip flight between Atlanta and Montgomery until June 30, 1980.[7] In addition, the Board ordered Delta (and Republic) to give 90 days notice of any service reduction at Montgomery, and to submit weekly reports of passenger traffic at Montgomery. The basis of the Board's order was its finding that "the cessation of nonstop service between Atlanta and Montgomery in the absence of any replacement or alternative service reasonably appears to deprive the community of essential air service during the summer peak season."[8] On June 24, 1980, the Board extended all of its requirements until July 30, 1980,[9] but then on July 11, 1980, it terminated the requirements effective July 16, 1980.[10]

## II. STATUTORY BACKGROUND

From 1938 to 1978, interstate air transportation was subject to strict regulation under the Civil Aeronautics Act of 1938 and the Federal Aviation Act of 1958. Under that regulatory scheme, a carrier could not enter or withdraw from a market without CAB approval,[11] which was to be based on a finding of "public convenience and necessity."[12]

In 1978, Congress enacted the Deregulation Act, which replaced the old form of regulation with a new economic regime that relied heavily on free-market mechanisms.[13] That Act provides for a gradual reduction of the CAB's powers through December 31, 1984, at which point the Board is to be abolished. Most importantly, the Act substantially reduced the regulation of entry into, and exit from, air service markets. This was to allow the carriers themselves to respond quickly to changes in the supply and demand conditions of particular markets. Congress included in the Act, however, a 10-year regulatory program for "Small Community Air Service."[14] Under that program, the CAB was given broad powers to help ensure that small communities would not be severely harmed by the transition to the free market system.[15] The objective of the program was to promote the statutory goal of "maintain[ing] a comprehensive and convenient system of continuous scheduled airline service for small communities and for isolated areas."[16] It is that set of statutory provisions that is at issue in this case.

---

See Delta Brief at 4–6.

5. Joint Appendix (J.A.) at 26. Eastern was required to do so by section 401(j) of the Act, 49 U.S.C. § 1371(j) (Supp. III 1979).

6. J.A. at 36.

7. *In re Eastern Air Lines, Inc.*, Order 80–5–170 (May 23, 1980) (J.A. at 3).

8. *Id.* at 3 (J.A. at 5).

9. *In re Eastern Air Lines, Inc.*, Order 80–6–147 (June 24, 1980) (J.A. at 10). Delta and Republic also filed petitions for reconsideration, which, in effect, were denied. *In re United Air Lines, Inc., Eastern Air Lines, Inc.*, Order 80–8–180 (August 29, 1980) (J.A. at 16).

10. *In re Eastern Air Lines, Inc.*, Order 80–7–75 (July 11, 1980) (J.A. at 12).

11. 49 U.S.C. §§ 1371(a), (g), (j) (1976).

12. As a practical matter, this regulation did not produce the results that the legislation promised. *See, e.g.*, S.Rep.No.631, 95th Cong., 2d Sess. 70–71 (1978).

13. One stated policy of the Act was the "placement of maximum reliance on competitive market forces and on actual and potential competition ... to provide the needed air transportation system." Section 102(a)(4), 49 U.S.C. § 1302(a)(4) (Supp. III 1979).

14. Section 419, 49 U.S.C. § 1389 (Supp. III 1979).

15. After the CAB is abolished the program is to be managed by the Department of Transportation. Section 1601(b)(1)(A), 49 U.S.C. § 1551(b)(1)(A) (Supp. III 1979).

16. Section 102(a)(8), 49 U.S.C. § 1302(a)(8) (Supp. III 1979).

## III. ANALYSIS

The Board argues, first, that this case is moot, and, second, that it has the statutory authority to take the actions at issue. We disagree on both points. Therefore, we reverse.[17]

### A. *Mootness*

■ The CAB argues that the issues raised in this case are moot due to the fact that the Board terminated all restrictions at issue: As of July 16, 1980, Eastern was permitted to withdraw from the Atlanta-Montgomery market, and Delta was no longer under the notice and reporting requirements. Delta responds by arguing that the basic legal issues raised in this case are "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Delta notes that the Board has asserted the authority at issue in this case three times since the enactment of the Deregulation Act, and could very well reassert that authority to Delta's detriment in the future. We agree, and therefore hold that the case is not moot.

As the Supreme Court has stated, a case is not moot if "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See also Chamber of Commerce of the United States v. Department of Energy,* 627 F.2d 289 (D.C.Cir.1980). In view of the breadth of authority that the Board has asserted, and the extent of Delta's operations, such a "cognizable danger" does exist.

### B. *CAB Authority to Postpone Eastern's Suspension of Service*

The CAB argues that section 419 of the Federal Aviation Act, as amended, authorizes its requirement that Eastern temporarily maintain Atlanta-Montgomery service. That provision originated in the Deregulation Act and constitutes the heart of the statutory protection afforded small communities. The core of section 419 is the "essential air transportation" guarantee. Essential air transportation is defined in the Act as

> scheduled air transportation of persons to a point provided under such criteria as the Board determines satisfies the needs of the community concerned for air transportation to one or more communities of interest and insures access to the Nation's air transportation system, at rates, fares, and charges which are not unjust, unreasonable, unjustly discriminatory, unduly preferential, or unduly prejudicial, and—
>
> (1) with respect to air transportation to any point (other than in the State of Alaska), in no case shall essential air transportation be specified as fewer than two daily round trips, 5 days per week, or the level of service provided by air carriers to such point based on the schedules of such air carriers in effect for calendar year 1977, whichever is less . . . .[18]

For the ten-year period following the enactment of the Deregulation Act, section 419 authorizes the Board to institute a system of regulation and subsidization in order to ensure that qualified communities receive essential air transportation.[19] The Board states that the actions at issue in this case were authorized as part of that system.

The issue underlying this dispute, however, is how a community can qualify for the essential air transportation guarantee, and specifically, whether Montgomery qualified in the spring and summer of 1980. Section 419(a)(2) provides that the CAB shall make essential air transportation determinations for two types of communities: (1) those that were serviced by not more than one carrier at the date on which the

---

17. We reverse the CAB on all points except its decision to impose reporting requirements on Delta. As discussed below, *see* pp. 6–7 *infra,* we conclude that Board acted within its authority in imposing those requirements.

18. Section 419(f), 49 U.S.C. § 1389(f) (Supp. III 1979).

19. *See* note 15 *supra.*

Deregulation Act was enacted;[20] and (2) other communities whose service later drops to not more than one carrier.[21] The Board was to make the first set of determinations within one year of enactment, and the other set of determinations within six months after it receives notice that the number of carriers providing service will drop to the requisite level. Montgomery does not fall into either of these categories. The CAB argues, however, that section 419(a)(10) authorizes its postponement of Eastern's service suspension. That section provides:

> Unless the Board has determined what is essential air transportation for any eligible point pursuant to paragraph (2) of this subsection, the Board shall, upon petition of any appropriate representative of such point, prohibit any termination, suspension, or reduction of air transportation which reasonably appears to deprive such point of essential air transportation, until the Board has completed such determination.[22]

The Board argues that it was authorized to make an essential air transportation determination for Montgomery, and that, pending such a determination, it had the authority to require Eastern to maintain the Atlanta-Montgomery service.[23]

Whether the Board had the authority to postpone Eastern's suspension turns on the last clause of section 419(a)(10): "until the Board has completed such determination." Unfortunately, that phrase is not without ambiguity. If the term "such" is read as referring to the phrase "[u]nless the Board has determined what is essential air transportation for any eligible point," then section 419(a)(10) can be interpreted to authorize the Board to make such a determina-

tion "upon petition of any appropriate representative." If so read, the section would independently authorize the Board to make an essential air transportation determination, and prior to doing so, to "prohibit any termination, suspension, or reduction of air transportation which reasonably appears to deprive [a] point of essential air transportation." Thus, section 419(a)(10) could be read to authorize inclusion of Montgomery within the CAB's Essential Air Service Program.

That interpretation, however, seems to be more the product of inartful draftsmanship than the intention of Congress. Though far from obvious, the intended referent of the term "such" is more likely to be the full phrase "[u]nless the Board has determined what is essential air transportation for any eligible point *pursuant to paragraph (2)*" (emphasis added). Under that reading of section 419(a)(10), the Board would be authorized to postpone service suspensions only at points covered by section 419(a)(2)— that is, points served by not more than one carrier. Since Montgomery was not such a point during the spring and summer of 1980, the Board's postponement of Eastern's suspension was unauthorized.

 This interpretation of section 419(a)(10) is supported by the policy implication of the alternative interpretation. If section 419(a)(10) were interpreted in the manner the CAB proposes, the Board would have the authority to establish levels of air transportation that it deems "essential" for any point, regardless of size. It could then maintain those levels at each point by preventing exit and/or subsidizing carriers to provide the service. That power, even if

---

**20.** Section 419(a)(2)(A), 49 U.S.C. § 1389(a)(2)(A) (Supp. III 1979).

**21.** Section 419(a)(2)(B), 49 U.S.C. § 1389(a)(2)(B) (Supp. III 1979). Section 419(a)(2)(C), 49 U.S.C. § 1389(a)(2)(C) (Supp. III 1979), provides for periodic review of these determinations.

**22.** 49 U.S.C. § 1389(a)(10) (Supp. III 1979).

**23.** In this case, the Board never made an essential air transportation determination, CAB Brief at 25, apparently because it concluded that

Eastern's proposed suspension did not "reasonably appear to deprive [Montgomery]" of such service. Section 419(a)(10), 49 U.S.C. § 1389(a)(10) (Supp. III 1979). The Board characterizes the action that it did take as a "transitional essential air service determination." CAB Brief at 34.

The CAB does not argue that any other statutory provision authorizes this or any of the other aspects of its action.

not fully exercized, would subvert the goal of deregulation to such an extent that we must be hesitant to believe that Congress intended to vest it in the CAB. Therefore, we conclude that the Board did not have the authority to postpone Eastern's service suspension.

As the CAB points out,[24] this interpretation of section 419(a)(10) leaves even small communities vulnerable to severe disruptions of service as long as they are served by two or more certified carriers of any size. Even if only two small certified commuter carriers service a community, our reading of section 419(a)(10) would not allow the Board to include the community in the Essential Air Service Program. We recognize this implication, but, given the statutory language, we must assume that this is what Congress intended. As the Supreme Court has stated, "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."[25]

The legislative history of section 419 does not lead us to any other conclusion, although, unfortunately, it too is ambiguous. The final form of the provision was the result of a conference committee compromise. The House bill, H.R. 12611, 125 Cong. Rec. H10338-39 (daily ed. Sept. 21, 1978), would have given the CAB the authority it claims, but the Senate bill, S2493, 125 Cong. Rec. S5907 (daily ed. Apr. 19, 1978), would not have. Although the essential service provisions of the House bill were widely supported and highly visible, when the con-

ference version was debated on the floor of the House, its substitute provisions received nothing but praise. See, e.g., 125 Cong.Rec. H13444-50 (daily ed. Oct. 14, 1978) (remarks of Rep. Anderson, Snyder, Harsha, Johnson). This peculiarity in the legislative history of the Act does give us pause, but it is not enough for us to ignore the only reasonable interpretation of the statutory language.

## C. The Board's Notice Requirement

As stated above, one facet of the CAB's action was to require those carriers still servicing Montgomery to provide 90 days notice prior to any reduction of service. The Board rested its authority to do so on section 401(j)(1).[26] That section, however, requires carriers to provide such notice only if they intend to reduce service below the point "which the Board *has determined* to be essential air transportation."[27]

■ The Board admits that it did not make an essential air transportation determination for Montgomery.[28] Moreover, since we have concluded that the Board had no authority to do so, it follows that the Board had no authority to impose the 90-day notice requirement on Delta or any other carrier.

## D. The Board's Reporting Requirements

In aid of its intervention into the Montgomery air service market, the Board required Delta to submit weekly reports on passenger traffic to and from Montgomery. The Board based its authority to do so on section 407(a), which states that "[t]he Board is empowered to require annual,

---

**24.** CAB Brief at 31–33.

**25.** *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**26.** 49 U.S.C. § 1371(j)(1) (Supp. III 1979).

**27.** *Id.* (emphasis added).
　Section 401(j)(1) provides:
　　No air carrier holding a certificate issued under this section shall—
　　(A) terminate or suspend all air transportation which it is providing to a point under such certificate; or

　　(B) reduce any such air transportation below that which the Board has determined to be essential air transportation for such point; unless such air carrier has first given the Board, any community affected, and the State agency of the State in which such community is located, at least 90 days notice of its intent to so terminate, suspend, or reduce such air transportation. The Board may, by regulation or otherwise, authorize such temporary suspension of service as may be in the public interest.

**28.** *See* note 23 *supra*.

monthly, periodical, and special reports from any air carrier." [29]

██ The Board required the reports from Delta in order to help determine whether Montgomery would receive essential air transportation without Eastern's service. As we have stated, that inquiry was beyond the authority of the Board. With that issue resolved, it is unclear whether the Board would ever use its section 407(a) authority again in this type of context. Nonetheless, the terms of section 407(a) are sufficiently broad to allow the Board to do so if it saw fit. The situation in Montgomery could have easily developed into one in which the Board would have had to make an essential air transportation determination under section 419(a)(2). The Board, therefore, could legitimately prepare for such an eventuality, under section 407(a), by collecting information about the market before it had to make the determination. Therefore, we conclude that the Board was authorized to impose its reporting requirements on Delta.

## CONCLUSION

██ In view of the foregoing, we reverse the CAB on all points except the reporting requirement. We do not do so without hesitation, however. We recognize that an agency's construction of its own governing act is entitled to great deference, *FEC v. Democratic Senatorial Campaign Committee,* —— U.S. ——, ——, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), particularly when the agency is attempting to implement parts of the act that are "untried and new," *Power Reactor Co. v. International Union of Electrical Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). In this case, however, we cannot conclude that the CAB's construction of sections 419(a)(10) and 401(j)(1) is " 'sufficiently reasonable' to

be accepted by a reviewing court." *FEC v. Democratic Senatorial Campaign Committee, supra.* Our conclusion, moreover, is not as extraordinary as it might appear on the surface. The Deregulation Act, in many respects, forced the CAB to implement a 180-degree shift in regulatory philosophy, which Congress anticipated would be difficult for the Board. Indeed, the Conference Report states:

In adopting this new, comprehensive legislation, which entirely overhauls the aviation regulatory system, Congress was mindful of recent activities of the CAB. This new charter is intended as a legislative mandate to the CAB both as to the direction and policy of aviation regulation and also, it should be noted, the limits of such policy. In short, Congress expects the deregulation of the aviation industry to move in accordance with this legislation and not in accordance with the, perhaps, differing concepts of some members of the CAB. The legislation establishes specific programs for increased competition. The legislation also includes a new policy statement which gives the CAB broad discretion to establish other programs to encourage competition .... Such programs are needed in the gradual and phased transition to a deregulated system. However, we expect that in developing these programs the Board will pay heed to the provisions of the policy statement giving specific directions to the Board. We also expect that any additional programs will not be incompatible with the specific programs Congress has established.[30]

In light of this congressional mandate, and the nature of the CAB's action, the level of deference the Board seeks would be inappropriate.

**29.** 49 U.S.C. § 1377(a) (1976). That section provides as follows:

 The Board is empowered to require annual, monthly, periodical, and special reports from any air carrier; to prescribe the manner and form in which such reports shall be made; and to require from any air carrier specific answers to all questions upon which the Board may deem information to be necessary. Such reports shall be under oath whenever the Board so requires. The Board

may also require any air carrier to file with it a true copy of each or any contract, agreement, understanding, or arrangement, between such air carrier and any other carrier or person, in relation to any traffic affected by the provisions of this chapter.

**30.** H.R.Rep.No.1779 (Conference Report), 95th Cong., 2d Sess. 56 (1978), U.S.Code Cong. & Admin.News 1978, pp. 3737, 3775.