**TRIANGLE IMPROVEMENT COUNCIL,** a non-profit organization created and organized under the laws of the State of West Virginia, as an individual, by and in behalf of its officers and members et al., individually and on behalf of all others similarly situated, Plaintiffs,

v.

William S. **RITCHIE,** Commissioner, State Road Commission of the State of West Virginia, O. R. Colan, Director of Right of Way Division, State Road Commission of the State of West Virginia, Elmer H. Dodson, Mayor of the City of Charleston, West Virginia, the City of Charleston, West Virginia, a city corporate and body politic, the City Council of the City of Charleston, the corporate board of that city, John Volpe, individually and as Secretary of Transportation of the United States, Lowell K. Bridwell, individually and as Administrator of the Federal Highway Administration of the United States and Frances C. Turner, individually and as Director of the Bureau of Public Roads of the United States, Defendants.

Civ. A. No. 68-183.

United States District Court,
S. D. West Virginia,
Charleston Division.

July 2, 1969.

John L. Boettner, Jr. (Legal Aid Society), Charleston, W. Va., for plaintiffs.

Stanley E. Preiser, Preiser, Greene & Hunt, and Anthony Halkias, Charleston, W. Va., Legal Division, State Road Commission, for William S. Ritchie and O. R. Colan, defendants.

B. Duffy Horan, City Sol., Charleston, W. Va., W. Warren Upton, Asst. U. S. Atty., Charleston, W. Va., for John Volpe et al., defendants.

## MEMORANDUM OPINION

JOHN A. FIELD, Jr., Chief Judge.

This dispute involves the location of a small segment of the Federal Interstate and National Defense Highway System as it is presently planned in a section of Charleston, West Virginia. The highway segment in question penetrates what is known as the Triangle area of Charleston which is populated predominately by low-income families of the negro race. The disputed routing was approved in August 1964, and plaintiffs herein seek declaratory and injunctive relief against further steps for construction of the highway as presently routed.

■ Plaintiffs are a group of residents and citizens of the Triangle area and a local civic improvement association known as , the Triangle Improvement Council (hereinafter TIC). The defendants include highway officials of the United States Department of Transportation (Federal defendants) and the State Road Commission of West Virginia (State defendants), and additionally, the City of Charleston, West Virginia, and its City Council and Mayor (Municipal defendants). The court recognizes that since this action was commenced certain personnel changes in the high levels of federal and state governments have resulted in different individuals being appointed to positions occupied by certain of the original defendants. Specifically, William S. Ritchie is now the Commissioner of the State Road Commission of West Virginia and John Volpe is now the Secretary of Transportation of the United States. Although Mr. Ritchie and Mr. Volpe have not been formally substituted as named defend-

ants, the court recognizes such a substitution to be proper and accordingly makes such a substitution, pursuant to R. 25(d) (1), F.R.Civ.P.

The prime bases of the action are the alleged failure of the state and federal defendants to comply with the relocation provisions of the Federal Highway Act of 1968, Pub.L. No. 90–495 (August 23, 1968), 23 U.S.C. Sections 501–511, and the alleged violation by the defendants of plaintiffs' constitutional rights under the Fourteenth Amendment. In addition, plaintiffs alleged a failure by the defendants to comply with the public hearing requirements of the federal statutes relative to the route selection for the interstate highway system in Charleston.

After an earlier denial of a motion by plaintiffs for a temporary restraining order, an evidentiary hearing was held on April 2 and 3, 1969, on a motion by plaintiffs for a preliminary injunction and motions to dismiss filed by the various defendants. The court being of the opinion that the allegations relative to the public hearing requirements were, based upon affidavits and exhibits submitted at the hearing on the temporary restraining order, plainly without merit, restricted the evidence in the proceedings on April 2 and 3 to the allegations relative to relocation; i.e., (1) failure to comply with the statutory provisions and (2) the constitutional equal protection question raised by plaintiffs relative to the relocation procedures.

Since this action was filed on December 3, 1968, a substantial number of motions, orders, etc. have been considered by the court and disposed of as follows.

Except for extensions of time within which to file answers, no formal action was taken in this proceeding until March 5, 1969. Prior to that time, however, certain collateral "side agreements" were made between counsel relative to the matter of interstate highway progress in the Triangle area. Disagreements eventually arose relative to the breadth and import of the "side agreements,"

and on March 5, 1969 plaintiffs moved the court for a temporary restraining order which would have effected a cessation of all interstate highway activity in the Triangle area. Certain broad subpoenas duces tecum were also issued on that date, directed to federal and state highway officials.

On March 10, 1969, a hearing on the motion for the temporary restraining order was held. At that time, motions to quash the subpoenas duces tecum which had been issued were filed and argued. As a result of that hearing the court was of the opinion that injunctive relief would irreparably hinder the interstate highway program and that the subpoenas duces tecum were overly broad and oppressive. Accordingly, a motion for a temporary restraining order was denied and the motions to quash the subpoenas duces tecum were granted.

On March 10, 1969, motions to dismiss the complaint were filed on behalf of the federal defendants, the state defendants, and the municipal defendants. These motions were supported by certain affidavits and exhibits. At that time, the motion to dismiss the municipal defendants was denied, and other dismissal motions were held in abeyance, and a hearing on the dismissal motions and on a motion for a preliminary injunction was set for April 1, 1969. An order reflecting the March 10 actions of the court was submitted by counsel and was entered on March 21.

On March 13, the plaintiffs caused more subpoenas to be issued for certain federal and state highway officials for the avowed purpose of taking the depositions of those officials. The state and federal defendants moved to quash the new subpoenas, alleging oppressiveness and lack of time to comply therewith prior to the April 1 hearing. A hearing on the motions to quash was held on March 17, and the court, being of the opinion that the motions were well taken, granted them and thereby quashed the subpoenas. An order reflecting this action was entered on March 24.

On March 24, plaintiffs moved the court to be permitted to amend their complaint in order to allege jurisdiction under the Administrative Procedure Act, 5 U.S.C. Section 701 et seq. The court was of the opinion that this motion was tardily made, and it was denied by order of March 28.

Also on March 24, the plaintiffs filed motions for production of certain documents alleged to be in the possession of federal and state officials. The defendants, on March 28, moved that the motions for production be quashed by the court. The court heard these motions on March 29, and being of the opinion that it would be overly burdensome to require their production on such short notice prior to the hearing on this matter, denied the motions for production and granted the motions to quash. However, the court instructed the defendants to bring all relevant material to the scheduled hearing, in order that plaintiffs and the court might have the benefit of it. In addition, the hearing date was set over until April 2 in order to accommodate counsel for the state defendants. An order reflecting these actions was entered on April 28.

Prior to March 29, the court had met informally with counsel for the various parties, at which time counsel were advised that the court considered any challenge to the highway routing decision to be barred by laches, and that the court was of the opinion that the only allegation of possible merit made by plaintiffs related to the displacee relocation assistance program being administered by the State of West Virginia. Counsel were accordingly requested to prepare for the hearing with that in mind, and to present only evidence which related to the relocation assistance program.

On March 29, plaintiffs filed a formal written motion with the court to the effect that they be permitted to present evidence at the scheduled hearing on all the issues and theories of law embodied in their complaint. Such motion was denied, in accord with the court's previous decision to restrict evidence at the hearing to that which was material and relevant to the relocation issue. The denial of that motion was reflected in an order entered subsequent to the hearing, on April 28.

On April 2 and 3, the evidentiary hearing was held relative to the various dismissal motions and to the motion for a preliminary injunction which had been formally filed by plaintiffs on April 1. At the conclusion of the presentation of evidence, the court denied the various dismissal motions and the motion for a preliminary injunction. Counsel thereupon agreed to submit the case to the court on the record as then developed for decision on its merits. It was further agreed that briefs on the merits of the case would be submitted by April 23, which date was subsequently changed, on plaintiffs' motion, to May 5. In addition, the court reconsidered its ruling relative to the denial of plaintiffs' motion to amend its jurisdictional allegations. The order denying them the right to allege the Administrative Procedure Act, 5 U.S.C. Sections 701 et seq. as a basis for jurisdiction in this proceeding was vacated and the motion to amend was granted. An order reflecting the court's actions on all of these matters was entered on April 29.

By May 8 all defendants had filed answers in this matter, counsel had filed briefs with the court on the merits of the case, and the case was submitted for final disposition.

## BACKGROUND DISCUSSION

In 1956, the Congress of the United States provided for the construction of the extensive Interstate Highway System. The statutory bases for the program were the Federal-Aid Highway Act of 1956 and the Highway Revenue Act of 1956. Numerous amendments have since been made to the original statutes, and, in 1968, the relocation assistance provisions were greatly expanded. Prior to 1968, however, much had transpired relative to the routing of the interstate system in the Kanawha Valley and Charleston, West Virginia, areas.

Charleston was planned as the hub of the interstate system in West Virginia, and three interstate routes will converge on the Charleston area. Interstate Route 77, running north-south from Cleveland, Ohio to the southeastern United States, and Interstate Route 64, running east-west from coast to coast, both come through the Charleston area. The third Interstate Route, I–79, enters the Charleston area from the north, beginning at Erie, Pennsylvania, and terminating at Charleston.

Extensive planning, research, public discussion, and controversy were necessarily attendant upon the routing of these highways in the Charleston area. The record indicates that public hearings relative to these routes were held in Charleston on March 29, 1960 and June 10, 1964, and transcripts of these hearings have been submitted to the court. Prior to the 1964 hearing, numerous studies were made relative to the routing, the most important of which, the so-called TAMS study, was completed in early 1964. The proposed system recommended by the TAMS study was discussed at the 1964 hearing, and, along with nine alternate routes, was portrayed by maps, aerial photographs, and numerous exhibits. At the time of the 1964 hearing, the State Road Commission of West Virginia had indicated no preference among the suggested routes and it emphasized that none would be chosen until a study of developments at the hearing was made along with other relevant data.

Consideration of the interstate system routing in Kanawha County and Charleston was concluded in August of 1964, with final approval of the Bureau of Public Roads being given on August 31, 1964. As approved, the routing of I–77 and I–64 (primary designation of the highway is I–77, secondary designation is I–64, and is hereinafter referred to as I–77) penetrates the Triangle area of Charleston. No protest from the plaintiffs in this action relative to that routing was made until December 3, 1968, when this action was filed.

Construction of the interstate highway system through the Triangle area involves two interstate projects of the State Road Commission. These two projects are designated I–77–3(66)100 (hereinafter Project A) and I–77–3(67)98 (hereinafter Project B). The evidence indicates that each of these projects involves part of the Triangle area, and while all of the Triangle area affected by the interstate system is located within the confines of these two projects, the entire area encompassed by these projects includes areas outside the Triangle.

The evidence indicates that the Bureau of Public Roads, in addition to approving the routing of the highway, is required to make certain step-by-step authorizations of funds to be utilized in the projects such as surveying, abstracting titles, acquiring rights-of-way, and various other aspects of the highway construction. In this regard, the two subject projects were in the right-of-way acquisition and displacee relocation stage when this action was commenced. The actual dates on which authorization for right-of-way acquisition was given were, according to the testimony at the hearing, as follows:

1. PROJECT A—(four separate authorizations)
   - (a) April 19, 1966
   - (b) September 22, 1966
   - (c) January 27, 1967
   - (d) May 23, 1967

2. PROJECT B—November 30, 1966

It is apparent, therefore, that complete authority for right-of-way acquisition in the Triangle area had been given by May 23, 1967, and had been in effect over a year prior to the enactment of the 1968 Highway Act.

At the time of the approval of the routing in question by the Bureau of Public Roads, the applicable statutory provisions relative to displacee relocation assistance was 23 U.S.C. Section 133. Compliance with that statute, enacted in

1962 in Pub.L. No. 87–866, was required before a state could participate in the federal financial assistance available for highway construction. Plaintiffs do not allege that the state defendants were not complying with Section 133, but contend that the provisions of 23 U.S.C. Sections 501–511 (Pub.L.No. 90–495), which repeals Section 133, now apply and are not presently being met by the state defendants. As noted, the new relocation assistance provisions (Sections 501–511) were enacted August 23, 1968, over a year after the last authorization for right-of-way acquisition was given the West Virginia State Road Commission by the Bureau of Public Roads.

The record in this case fails to indicate any complaints from the plaintiffs herein prior to the institution of this action relative to the highway location in the Triangle area. The record does, however, indicate that State Road Commission officials met with TIC members and Triangle area residents in 1965 and discussed the impact that the interstate would have on that area. None of the questions raised in this action were raised at that conference.

## THE ROUTING DECISION

As noted above, the routing of I–77 through the Triangle area was approved by the federal authorities August 31, 1964. Prior to that time, on August 20, 1964, the State Road Commission of West Virginia had finalized its determination of the manner in which the interstate system in Kanawha County and Charleston should be routed. The record in this action indicates that the State's routing determination complied with the federal statutory and regulatory requirements in effect at that time. They had made a comprehensive study of the matter, had held open and well-advertised public hearings, and had, as administrative officials must do, made the decision on the interstate routing. The federal government which pays for 90 percent of the cost of interstate high-

way construction approved the state action. The endorsement by the federal authorities of the state's routing decision is strong evidence that the proper procedure for highway planning and routing had been followed.

Furthermore, it is undisputed that the plaintiffs herein sat on their alleged rights for over four years until the interstate program was well into the right-of-way acquisition stage before seeking any judicial review of the administrative determination. I am accordingly of the view that the doctrine of laches precludes review of that decision at this late date, and that the only question of possible merit raised in this instance relates to the displacee relocation procedure relative to those persons living in the I–77 corridor in the Triangle area.

Of further relevance on the question of undue delay by plaintiffs in bringing their action is the testimony by federal and state officials relative to the effect injunctive relief might have upon the entire interstate highway program in Charleston. The evidence indicates that such relief might delay completion of the system by as much as five years, would cause comprehensive new planning procedures to be initiated, would result in an additional financial burden of staggering proportions, and could result in a complete cessation of the flow of federal interstate highway-aid funds into this area of West Virginia.

## THE RELOCATION QUESTIONS

As noted above, the displacee relocation assistance provisions relied upon by the plaintiffs herein were enacted into law on August 23, 1968. Pursuant to its provisions, the Bureau of Public Roads issued Instructional Memorandum (IM) 80–1–68 on September 5, 1968, with an effective date of August 23, 1968.

In the two highway projects which affect the Triangle area, a substantial number of persons required relocation housing. Evidence presented at the eviden-

tiary hearing indicated the following number of persons in Projects A and B either had been or were to be relocated, as of February 28, 1969.

### In Projects A and B – as of February 28, 1969

|  | Project A | Project B | Total |
|---|---|---|---|
| To be relocated | 380 | 496 | 876 |
| Had been relocated | 913 | 401 | 1,314 |
|  |  |  | 2,190 |

Of these totals, however, not all are or were within the confines of the Triangle area as such. The figures for the Triangle area itself were as follows:

### In Triangle area – as of February 28, 1969

|  | Project A | Project B | Total |
|---|---|---|---|
| To be relocated | 104 | 180 | 284 |
| Had been relocated | Not presented | Not presented | Not presented |

The number of persons who had not been relocated from Projects A and B in the Triangle area as of August 23, 1968 (the enactment date of the Federal-Aid Highway Act of 1968, and of BPR IM 80–1–68) was not presented. Accordingly, the number of persons relocated since August 23, 1968 was not determined.

Prior to consideration of whether the relocation program of the State Road Commission complies with 23 U.S.C. Sections 501–511 and BPR IM 80–1–68 is the question of whether those relocation provisions are at all applicable in the present controversy. Plaintiffs contend that the relocation provisions apply but are not being complied with, and, in fact, cannot be complied with; while defendants contend the relocation provisions do not apply to displacee relocation in Projects A and B in the subject area, and, in any event, the State Road Commission's displacee relocation program would satisfy those provisions.

## JUDICIAL REVIEW

The plaintiffs allege jurisdiction in this court on the basis of federal civil rights statutes, 42 U.S.C. Sections 1981–1983, 2000d, federal questions raised, 28 U.S.C. Section 1331(a), suits against officers and employees of the United States, 28 U.S.C. Section 1361, the Administrative Procedure Act (APA), 5 U.S.C. Sections 701–706, and declaratory judgment statutes, 28 U.S.C. Sections 2201 and 2202.

Without making a detailed analysis of each of these jurisdictional allegations, I am satisfied that judicial review of agency action pursuant to the federal highway program may be had. Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967). There is nothing in the federal statutes which indicates that Congress intended to immunize the Bureau of Public Roads from judicial scrutiny of its acts. As was stated in the recent case of Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Calif. 1968), which involved relocation of urban renewal displacees (at 442):

"* * * The test for judicial reviewability, however, is not, as contended by defendants, whether the statute provides for it, but whether the statute precludes it. Federal administrative action is subject to judicial review unless the statute, itself, precludes such review."

Western Addition cites Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) as authority for a basic presumption that judicial review is available to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action. It points out that this rule has been reinforced by the Administrative Procedure Act. Judge Sweigert stated in *Western Addition* (294 F.Supp. at 442):

> "When no other remedy for judicial review is provided, persons suffering legal wrong because of administrative action or otherwise adversely affected or aggrieved by it within the meaning of a relevant statute, may proceed under the Administrative Procedure Act (5 U.S.C. §§ 701, 702, 704) except to the extent that statutes preclude judicial review or agency action is committed to agency discretion by law."

In this instance, as in *Western Addition*, there is no statute precluding judicial review. I am accordingly of the view that the administrative decisions involved in this matter are judicially reviewable under the Administrative Procedure Act, 5 U.S.C. Sections 701–706.

## STANDING OF PLAINTIFFS

■ Prior to any consideration of the merits of this matter, brief review should also be given to the question of whether the parties bringing this action have standing to challenge the actions of the defendants. As it was put by the Supreme Court in its recent consideration of the standing problem, Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968):

> " * * * In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable. * * * "

Title 5 U.S.C. Section 702, the section of the Administrative Procedure Act relative to the "right of review," provides that:

> "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Under this section, the Supreme Court has held that a person is "aggrieved" if he asserts a personal interest which the "relevant statute" was designed to protect. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). The relevant statute involved here, which is the Federal Highway Act of 1968, particularly the relocation assistance provisions contained therein, clearly was intended to protect persons such as the plaintiffs in this matter.

Several recent cases have allowed litigants who were situated similarly to the plaintiffs herein standing to challenge government projects, particularly Scenic Hudson Preservation Conference v. Federal Power Comm., 354 F.2d 608 (2d Cir. 1965), Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. denied 390 U.S. 921, 88 S. Ct. 857, 19 L.Ed.2d 982 (1968), Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) and Western Addition Community Organization v. Weaver, supra. In addition, the Supreme Court has given a broadened scope to the Administrative Procedure Act in Hardin v. Kentucky Utilities Co., supra, and Abbott Laboratories v. Gardner, supra. These cases would appear to have rejected the view expressed in such cases as Green-Street Association v. Daley, 373 F.2d 1 (7th Cir. 1967), and Johnson v. Redevelopment Agency of City of Oakland, 317 F.2d 872 (9th Cir. 1963), which would deny relocation displacees the standing to challenge governmental action relative to them.

In the light of the authorities cited above, I am of the view that under the broadened scope of the Administrative Procedure Act, the plaintiffs in this matter would qualify as sufficiently "aggrieved" under a "relevant statute" to

permit this court to proceed with consideration of the merits of their claims.

## THE STATUTORY· QUESTION

■ As was previously stated, the basic question in this whole matter turns largely upon the applicability of the displacee relocation provisions of the 1968 Highway Act to the particular segments of I–77 which penetrate the Triangle area of Charleston. Plaintiffs, of course, assert that the provisions apply, while the defendants assert that they do not apply. An examination of the statute itself, and the administrative interpretations of it (IM 80–1–68), is appropriate to determine which of the parties should prevail on this issue.

In 23 U.S.C. Section 502, relating to "Assurances of adequate relocation assistance program," it is provided that:

"The Secretary shall not approve any project under section 106 or section 117 of this title which will cause the displacement of any person, business, or farm operation unless he receives satisfactory assurances from the State highway department that—

(1) fair and reasonable relocation and other payments shall be afforded to displaced persons in accordance with sections 505, 506, and 507 of this title;

(2) relocation assistance programs offering the services described in section 508 of this title shall be afforded to displaced persons; and

(3) within a reasonable period of time prior to displacement there will be available,. to the extent that can reasonably be accomplished, in areas not generally less ·desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by the Secretary, equal in number to the number of and available to such displaced families and individuals and reasonably accessible to their places of employment."

The two statutory sections cited in the first sentence of Section 502 provide for the submission of certain plans, specifications, and estimates for federal-aid highway projects to the Secretary of Transportation by the state highway department. Those necessary to be submitted are to be such "as the Secretary may require," and his approval of them is deemed to place a contractual obligation upon the federal government.

In the instant case, the testimony of the Secretary's representatives was clearly to the effect that the West Virginia State Road Commission had complied with all federal requirements relative to right-of-way acquisition in Projects A and B in the Triangle area. In fact, as noted above, authority for right-of-way acquisition in Projects A and B was given by the federal government in 1966 and 1967, with the final authorization being given on May 23, 1967.

In 23 U.S.C. Section 504(b), the 1968 Highway Act provided that:

"Any project agreement with a State highway department executed before the date of enactment of this chapter with respect to property which has not been acquired as of the date of enactment of this chapter under any such program shall be amended to include the cost of providing the payments and services described in section 502 with respect to such property."

In the Instructional Memorandum (IM 80–1–68) which the Bureau of Public Roads issued pursuant to the relocation provisions of the 1968 Highway Act, the following provisions relative to applicability were set forth in paragraphs 2b (1), 2b(2) and 5b:

"2. * * ·*

b. The provisions of this memorandum are applicable to the following:

(1) All Federal-aid highway projects authorized after August 23, 1968, involving rights of way which are occupied by an individual, fami-

ly, business, farm operator, or non-profit organization.

(2) All Federal-aid highway projects authorized on or before August 23, 1968, on which individuals, families, businesses, farm operations, and nonprofit organizations have not been displaced.

\* \* \* \* \* \*

"5. \* \* \*

b. The above assurances are not required where authorization to acquire right-of-way or to commence construction has been given prior to the issuance of this memorandum. The State will pick up the sequence at whatever point it may be in the acquisition program at the time of issuance of this memorandum."

With specific regard to the West Virginia State Road Commission's efforts in this area, the testimony of both federal and state employees indicates to me that an active and continuing displacee relocation assistance program has been and is being carried out. It appears that such a program was in effect even prior to enactment of the 1968 Highway Act. In any event, the West Virginia Road Commission personnel in authority in the area of relocation assistance, and the personnel in the West Virginia office of the Bureau of Public Roads, interpreted the statutory and regulatory language to mean that the relocation requirements of the 1968 Act were not applicable to the particular projects here in question since final authority for right-of-way acquisition was given long before the 1968 Act was passed. In particular, they felt that the correct position relative to applicability of the 1968 Act was set forth in paragraph 5b of IM 80–1–68, to the effect that:

"The above assurances are not required where authorization to acquire right-of-way or to commence construction has been given prior to the issuance of this memorandum. The State will pick up the sequence at whatever point it may be in the acquisition pro-

gram at the time of issuance of this memorandum."

The defendants submit that even if there is a question as to whether the assurances were or were not required in this instance, the agency's construction of the applicable statutes and regulations should be given considerable weight and not be overturned unless plainly incorrect. They cite several cases in support of this position, including Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), wherein Mr. Chief Justice Warren stated (at 16, 85 S.Ct. at 801):

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Compensation Comm. of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L. Ed. 136. See also e. g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Universal Battery Co., v. United States, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051, 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." ' Power Reactor Development Co. v. International Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1539, 6 L.Ed.2d 924. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

'Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the

regulation if the meaning of the words used is in doubt. * * * [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' Bowles v. Seminole Rock Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L. Ed. 1700.''

I am convinced that this is a valid summary of the law in this area. I am further convinced, after analyzing the statutory provisions, their legislative history, and the instructional memoranda issued pursuant thereto, that Congress could not have intended that projects authorized and approved several years prior to the enactment of the 1968 statute were to be subject to inflexible and strict compliance therewith. The administrative agency did not give it such an interpretation, and I am of the opinion that the agency's determination had a rational basis and should not be disturbed.

In any event, testimony of federal and state highway officials, especially that of the State Road Commission Director of Right-of-Way acquisition, O. R. Colan, indicates to me that the authorities are making a sincere effort to integrate the provisions of the relocation assistance provisions of the 1968 Highway Act into its program. Responsible public officials at both the federal and state levels testified forcefully and credibly that the West Virginia State Road Commission's displacee relocation program relative to the two projects affecting the Triangle area is in compliance with the provisions of the 1968 Act in a practical if not a formal manner, even though such compliance is not legally required. They assured the court that displacement would be conducted at a slow pace in order that appropriate replacement housing could be found, and that no one will be displaced unless suitable (i. e., decent, safe, and sanitary) and lawful relocation housing is available, and further that relocation assistance payments required by the statute would be made in all cases.

As mentioned above, this testimony indicates the federal defendants have determined that the West Virginia authorities can meet, are meeting, and will continue to meet the requirements of the regulations and statutes in its relocation program. As the case law indicates, such a determination is entitled to great weight and should be confirmed if premised on rational grounds. As many cases, including Western Addition Community Organization v. Weaver, supra, and Road Review League v. Boyd, supra, indicate, courts should not undertake the administration of complex and far reaching federal programs, but upon appropriate judicial review should determine only whether the agency administering the program is in substantial compliance with the applicable statutes and regulations.

I should also reiterate that the evidence shows that as of February 28, 1969, only 284 persons were residing in the I–77 corridor in Projects A and B in the Triangle area of Charleston, West Virginia. It can be logically assumed that that number has been somewhat reduced in the period that has elapsed since February. In considering injunctive relief this court should, of necessity, weigh its possible beneficial effect upon this group of Triangle residents against its potential disruptive effect upon the program of the state and federal authorities charged with the responsibility of building east-west and north-south interstate highway corridors through West Virginia and the nation. The federal and state officials have assured the court that the persons residing in the interstate corridor in the Triangle will be dealt with in a manner that comports with the federal statutes and regulations, and I must assume that the highway officials gave these assurances in good faith. The evidence certainly supports such an assumption on my part.

## THE CONSTITUTIONAL QUESTION

Plaintiffs further allege that even assuming that the State Road Commission's relocation program is lawful

in other respects, it is being unconstitutionally administered insofar as it affects negro citizens residing in the I–77 corridor in the Triangle area. They allege that the dislocation of negroes into a "racially closed" housing market existing in Charleston constitutes a denial of equal protection of the laws proscribed by the Fourteenth Amendment to the Constitution of the United States.

Without discussing this allegation in depth, I refer again to the representations made by the state and federal defendants to the court. They have assured the court that the relocation program can be carried out in complete compliance with existing law and that no racial discrimination will be practiced in the conduct of the program. Furthermore, I am satisfied from the evidence that the subject displacees from the I–77 corridor in the Triangle area can obtain housing within the range of their economic means without racial discrimination which would be of such a nature as to raise federal constitutional problems. It is clear that their greatest problem relative to housing is the basic lack of the financial means to secure such in many areas of Charleston. Many others, of all races, are faced with a similar problem, but this is not the result of invidious racial discrimination.

The evidence indicates that adequate relocation housing, on an open racial basis, will be available in the Charleston area for an orderly relocation of the displacees from the interstate highway corridor. I am satisfied that this evidence is accurate. Even should no housing be available for dislocatees in the private housing market, the evidence clearly demonstrates that there is ample public housing in the Charleston area to accommodate the limited number of individuals remaining in the I–77 corridor in the Triangle area.

Furthermore, evidence presented at the hearing on this matter suggests that some individuals in the subject corridor have refused offers of satisfactory and lawful relocation housing, unhappily in an attempt to further and improve the posture of this lawsuit. In at least one instance such refusal was at the request of counsel for plaintiffs or their associates. This casts some question on the sincerity of the challenge plaintiffs have made to the relocation effort, and indicates that their primary objective is to block the interstate route which was finalized some five years ago.

Finally, it should be noted that the plaintiffs have specifically disavowed that there was any basic or specific racially discriminatory purpose on the part of defendants in the routing of I–77 or in the relocation of the displacees in that routing. There has been no showing that the location of this highway affects citizens of the negro race more adversely than it affects others in similar economic circumstances. That sufficient housing is available in the Charleston area to permit lawful relocation of all displacees, without regard to race, is sufficient to distinguish this case from the basic decision relied upon by plaintiffs, Norwalk CORE v. Norwalk Redevelopment Agency, supra. In that case the court ruled that a cause of action was stated when the plaintiffs alleged that the authorities were not even attempting to assure relocation for non-whites to the same extent as they were for whites.[1] In the present

1. "We do not understand plaintiff's constitutional argument to be that defendants must end discrimination in the Norwalk open housing market through the relocation plan, or even that defendants must find integrated housing for those displaced by the Project. Those are arguments we need not consider until they are appropriately put to us.

"What plaintiffs' complaint alleges, in substance, is that in planning and implementing the Project, the local defendants did not assure, or even attempt to assure, relocation for Negro and Puerto Rican displacees in compliance with the Contract to the same extent as they did for whites; indeed, they intended through the combination of the Project and the rampant discrimination in rentals in the Norwalk housing market to drive many Negroes and Puerto Ricans out of the City of Norwalk. The argument is that proof of these allegations would make out a case of violation of the equal protection clause. We agree." (395 F.2d at 930)

**32**

case the evidence that all racial groups are being provided relocation assistance on the same basis and to the same extent precludes, in my view, any valid constitutional question on this facet of this controversy.

I conclude that plaintiffs' allegations relative to the relocation assistance program on both the statutory and constitutional grounds are without merit, and accordingly the defendants are entitled to judgment on the issues and the complaint should be dismissed. This opinion will be filed as my findings of fact and conclusions of law on the issues presented, and counsel may submit an appropriate order incorporating this opinion by reference therein.