BUNGE CORPORATION, St. Charles Grain Elevator Co., Farmers Export Co., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 29–81C, 559–81C and 728–81C.

United States Claims Court.

May 18, 1984.

Robert B. McCaw, Washington, D.C., with whom were Arthur F. Mathews, Terrence J. Leahy and Wilmer, Cutler & Pickering, Washington, D.C., for plaintiffs.

Robert L. Ashbaugh, Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard, Thomas W. Petersen and Robert Paul, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

Plaintiffs seek a partial refund of fees paid to the Federal Grain Inspection Service for inspecting and weighing their grain from October 1977 to September 1981. The parties have stipulated the facts and cross-moved for summary judgment.

### Facts

Plaintiffs operate high speed grain elevators through which they store and elevate

grain destined for export. They are subject to the Grain Standards Act (the Standards Act), 7 U.S.C. §§ 71–87i (1982), and to regulation by the Federal Grain Inspection Service (FGIS), the agency charged with the Act's administration.

The Standards Act requires that grain be officially inspected and weighed before it is shipped abroad. Weighing and inspection are normally conducted by FGIS personnel. This is a significant departure from earlier practice. Prior to 1976, grain was inspected by individuals who were licensed by the Secretary of Agriculture and employed by some 100 state, trade and private agencies. Federal employees acted in a supervisory capacity and inspected grain only in cases of appeal. There was no federal law governing the weighing of export grain. This arrangement engendered widespread corruption and abuse, which Congress perceived to be a threat to the grain trade and to the entire economy. S.Rep. No. 747, 94th Cong., 2d Sess. 4–5 *passim* [hereinafter cited as S.Rep. No. 747], *reprinted in* 1976 U.S.Code Cong. & Ad.News 6522. Accordingly, it amended the Act to centralize regulation of the industry in FGIS. Pub.L. No. 94–582, § 4, 90 Stat. 2867, 2868–69 (1976).

The statute directs FGIS to recover its costs in providing these services by charging fees, and specifies that any fees so collected are to be deposited into a special revolving fund designated for the agency's use without fiscal year limitation. 7 U.S.C. §§ 79(j), 79a(*l*). The fees collected from plaintiffs under these sections are the subject of this litigation.

FGIS published its initial fee schedule on January 5, 1977, four days after it officially began operations and only six weeks after its creation. That schedule established fees for weighing and inspection services according to such factors as mode of transportation (e.g., box car or barge) and time of day. The fees, which were uniform nationwide, were calculated on the basis of a certain dollar amount for each hour of time spent by FGIS personnel in inspecting or weighing grain. 42 Fed.Reg. 1,019–20

(1977). At the time this schedule was published, the agency announced that the fees were intended to recover the direct costs of inspection and weighing (including related supervisory and administrative expenses), and further indicated that the rates would be adjusted as more reliable data became available. *Id.* at 1019.

Effective October 1, 1977, Congress amended the Standards Act to provide that the agency could not include supervisory and administrative expenses in its fee-recoverable costs. Pub.L. No. 95–113, Title XVI, §§ 1602(a), (b), 91 Stat. 913, 1025 (1977). The agency did not immediately respond with revised fee schedules. Instead, it issued to its employees revised instructions on how to allocate chargeable time. FGIS Notice 45, October 1, 1977. The agency's income from both appropriations and fees is deposited into a single revolving fund used to finance its operations. However, the agency maintains separate accounting records; FGIS personnel charge time spent on various activities to particular account numbers, allocating the cost of those activities either to fee-supported accounts or to appropriation-supported accounts. The effect of the 1977 amendments was to shift the cost of supervisory and administrative expenses related to inspection and weighing from fee-paying industry members to the taxpayers.

Soon thereafter, the agency announced a new schedule for inspection fees to become effective on January 9, 1978. That schedule changed the method by which certain inspection rates were calculated and announced the agency's intention to accumulate a "nominal operating reserve." 42 Fed.Reg. 61,987, 61,988 (1977). Under the new schedule, elevator operators were to be charged a certain dollar amount for each 1,000 bushels of grain inspected rather than for each hour of inspection time. *Id.* at 61,989. The effect of this change was to raise the cost to operators that moved large volumes of grain at high speeds. While the agency had informed the industry that it proposed to make this change, it

did not follow APA notice and comment procedures.

FGIS reduced its rates twice in the 24 months following implementation of the January 1978 schedule. 43 Fed.Reg. 52,-019 (1978); 44 Fed.Reg. 38,439 (1979). These changes were not preceded by notice and comment. However, in contemplation of returning to the hourly method of rate setting for inspection services, the agency published a request for comments. 44 Fed. Reg. 31,243 (1979). The hourly rate for on-line inspections was reinstituted as of December 2, 1979. 44 Fed.Reg. 52,838 (1979). Two later rate changes (an increase in January 1981 and a reduction in May 1981) were put into effect without notice and comment. 45 Fed.Reg. 79,736 (1980); 46 Fed.Reg. 27,070 (1981).

The Standards Act was amended again effective October 1, 1981. This amendment reversed the earlier change, reauthorizing the agency to include supervisory and administrative costs in setting fees. Pub.L. No. 97–35, Title I, §§ 155(1), (2), 95 Stat. 357, 371–72 (1981). The agency issued interim and then final fee schedules (again without notice and comment) reflecting the change. 46 Fed.Reg. 43,032 (1981); 47 Fed.Reg. 2254 (1982).

Because of these frequent fee adjustments, the revenues collected by FGIS fluctuated. In its first nine months of operation (January-September 1977), the agency lost money; its costs exceeded revenues by some $600,000. In Fiscal Years 1978 and 1979, however, inspection and weighing revenues exceeded costs by $5,231,000 and $2,944,000, respectively. In FY 1980 and 1981 the agency again lost money, amounting to $3,211,000 and $4,500,000, respectively. These losses were intentional, resulting from an agency decision to reduce its retained earnings. Cumulative data for the six-year period from 1977 through 1982 indicate that original inspection and weighing services were operated at an overall loss of $3,333,000.

In March of 1980 the agency responded to an industry request for cost and revenue information. Following that disclosure, Bunge wrote the agency requesting a refund of what it characterized as overcharges. When the agency refused, Bunge filed this action in January 1981. St. Charles and Farmers, the other two plaintiffs, followed suit in October and December of that year.

## Questions Presented

Plaintiffs raise a swarm of objections, both substantive and procedural, to the fee schedules promulgated by FGIS. The substantive objections are two-fold.[1] First, plaintiffs argue that the fee schedules must comply not only with the Grain Standards Act but also with Title V of the Independent Offices Appropriation Act of 1952 (IOAA), 31 U.S.C. § 9701 (1982). According to plaintiffs, the fees collected by FGIS do not comply with the IOAA as that statute has been interpreted.

Second, plaintiffs argue that even if the IOAA is not applicable, the court should give the Standards Act a narrow construction, much like that given to the IOAA, and hold the fee schedules illegal because they do not comply with the Standards Act as so construed.

Plaintiffs' procedural objections turn on claimed violations of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 (1982), committed by the agency in promulgating certain of the fee schedules and in other related actions. Plaintiffs also argue that the agency acted in an arbitrary and capricious manner in setting fees. 5 U.S.C. § 706(2)(A) (1982). Additionally, plaintiffs argue that certain agency actions affecting the level of fees are invalid because they were not published in the *Federal Register* as required by the Freedom of Information Act, 5 U.S.C. § 552(a)(1)(D) (1982). Defendant concedes some of the violations, disputes others and raises the defense of laches.

---

1. Plaintiffs' constitutional arguments—that they were deprived of their property without due process or just compensation—were abandoned at oral argument.

## Discussion

### I. Substantive Objections

#### A. *The IOAA*

Congress passed the Independent Offices Appropriation Act in 1951 to enable federal agencies that lacked specific fee-setting authority to recover the cost of providing certain services. The IOAA directs all federal agencies to charge fees for services they provide to special beneficiaries so as to make those services self-supporting; the statute does not apply to services that constitute official government business. The IOAA purports to give agencies unusually broad discretion in setting fees, allowing those fees to be based not only on the "direct and indirect cost to the Government [and] value to the recipient," but also on the "public policy or interest served, and other pertinent facts." Pub.L. No. 137, Title V, § 501, 65 Stat. 290 (1951).

This sweeping grant of authority raised such serious constitutional concerns that the Supreme Court felt constrained to give the statute a narrowing interpretation. *National Cable Television Association v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974) (*NCTA*); *Federal Power Commission v. New England Power Co.*, 415 U.S. 345, 351, 94 S.Ct. 1151, 1155, 39 L.Ed.2d 383 (1974) (*FPC*). The Court read the IOAA as authorizing the collection of fees only to reimburse the agency for the direct and indirect costs of providing services; it effectively read out of the statute any authority to base fees on considerations of public policy or other factors. The Court deemed such a construction necessary to avoid what would otherwise have been an unconstitutional delegation of the congressional authority to levy taxes. *NCTA*, 415 U.S. at 341, 94 S.Ct. at 1149.

The District of Columbia Circuit thereafter took this narrowing approach a giant step farther, holding that agencies promulgating fee schedules under the IOAA must follow certain stringent procedural requirements. *National Cable Television Association v. FCC*, 554 F.2d 1094, 1104–06 (D.C. Cir.1976) (*NCTA II*); *Electronic Indus-*

*tries Association v. FCC*, 554 F.2d 1109, 1117 (D.C.Cir.1976); *see National Association of Broadcasters v. FCC*, 554 F.2d 1118, 1128–29 (D.C.Cir.1976); *Capital Cities Communications, Inc. v. FCC*, 554 F.2d 1135, 1137–39 (D.C.Cir.1976). In addition, the D.C. Circuit held that fee schedules promulgated under the IOAA must be tailored so that the fee paid by each recipient of services is "roughly proportional" to the value conferred upon that recipient. *NCTA II*, 554 F.2d at 1105. While the court ruled that "precise equality between the value conferred and the fee charged" was not required, it indicated that a schedule would be held invalid if it had "the potentiality in any substantial number of individual instances to produce fees that are not reasonably related to the cost of the services that benefit the individual recipients who are being charged." *Id.* at 1108.

The fees set by FGIS do not meet the exacting standards established by the D.C. Circuit. Specifically, the fees imposed from October 1977 to September 1981 did not bear a precise and immediate relationship to the agency's cost of providing the inspection services. Further, the fee schedules were not so finely tuned as to preclude the possibility that the fees charged some recipients of the services might exceed the cost of providing services to them. Finally, FGIS did not comply with the elaborate procedural requirements announced by the D.C. Circuit. Plaintiffs urge the court to follow the D.C. Circuit's construction of the IOAA and hold the fee schedules invalid.

■ The court rejects plaintiffs' argument because the IOAA does not apply to the fee schedules issued by FGIS, which were promulgated entirely under the authority of the Grain Standards Act. The IOAA was intended to serve an interstitial function, providing fee-setting authority where Congress has not otherwise authorized the agency to collect fees. The legislation was designed to encourage agencies to make certain services self-supporting by

authorizing the imposition of fees for those services. *See* H.R.Rep. No. 384, 82d Cong., 1st Sess. 2–3 (1951); S.Rep. No. 2120, 81st Cong., 2d Sess. 6–7 (1950); 97 Cong.Rec. 4809 (1951). It would be inconsistent with this purpose to hold that the IOAA applies where an agency acts pursuant to a different, more specific grant of fee-setting authority. In such circumstances, the IOAA would interpose an additional barrier to the collection of fees, making it more difficult, not easier, to collect fees as Congress intended.

The wording of the two statutes supports this conclusion. While the IOAA and the fee-authorizing sections of the Grain Standards Act have some elements in common, they also contain requirements that are mutually inconsistent, making it difficult or entirely impossible for an agency to comply with both. For example, during part of the period here in issue, sections 79(j) and 79a($l$) of the Standards Act were amended to prohibit the agency from recovering administrative and supervisory costs as part of the fees charged. By contrast, even under the most restrictive interpretation of the IOAA, there is no such categorical exclusion. *See NCTA II,* 554 F.2d at 1105–06; *see also* Bureau of the Budget, Executive Office of the President, Budget Circular No. A–25, at 2 (1959), *cited with approval in FPC,* 415 U.S. at 349, 94 S.Ct. at 1154. If both statutes were applicable, FGIS would have been hard pressed to guess whether it was entitled to rely on the broader language of the IOAA or was constrained by the narrower language of the Standards Act.

The Standards Act also provides that the fees collected must be deposited into a special fund to be used by the agency without regard to fiscal year limitation. *See* p. 513 *supra.* Funds collected under the IOAA, on the other hand, must be deposit-ed into the Treasury and may not be spent by the agency at all, much less in another fiscal year.[2] If the court were to hold that FGIS must comply with both the IOAA and the Grain Standards Act in setting its fees, this would put the agency in the untenable position of having to deposit the same sums into two entirely separate accounts. It could also raise serious doubt whether the agency would be entitled to use those funds to support services in later fiscal years.

Limiting the applicability of the IOAA to situations where Congress has not specifically authorized the collection of fees makes eminent sense for yet another reason. When Congress affords an agency specific fee-setting authority, it generally speaks in terms more precisely circumscribed than those of the IOAA. As it did with the Grain Standards Act, Congress may wish to change the scope of that authority from time to time to conform to various policy objectives. If the IOAA were held applicable to *all* agency fee-setting efforts, Congress could well be frustrated in its objectives. For example, if it wished to alter an agency's fee-setting authority, amendment of the agency's specific fee-setting statute might not suffice; Congress might also have to amend the IOAA, thereby changing the applicable law for all other agencies. Nothing in the language or legislative history of the IOAA calls for this result. Indeed, accepted principles of statutory construction require that a specific legislative enactment be given effect to the exclusion of a more general one. *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974); *Abell v. United States,* 518 F.2d 1369, 207 Ct.Cl. 207, 224 (1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). The court therefore concludes that the IOAA is inapplicable to the fees

**2.** Plaintiffs make much of the fact that the language of the IOAA expressly providing that fees must be deposited into the Treasury as miscellaneous receipts was deleted when the statute was recodified in 1982. That deletion occurred because Congress deemed the language superfluous, as indeed it was. 31 U.S.C. § 9701 (1982)

(note). Absent specific authorization, an agency may not supplement its appropriation by spending funds it collects, but must deposit any such funds into the Treasury. 31 U.S.C. § 3302 (1982). Plaintiffs do not dispute that fees collected pursuant to the IOAA must in fact be handled in this manner.

set by FGIS, having been displaced by the fee-setting provisions of the Grain Standards Act.

### B. *The Grain Standards Act*

■ 1. Plaintiffs argue that even if the IOAA is not expressly applicable, the court should adopt a similarly narrow construction of the Standards Act and declare FGIS fee schedules invalid because they do not comply with sections 79(j) and 79a(*l*) as so construed. Plaintiffs suggest that such a narrowing construction is constitutionally required by the Supreme Court's holding in *NCTA*. As will be recalled, the Court there read the IOAA narrowly to avoid the possibility of an unconstitutional delegation of taxing authority. *See* p. 515 *supra*. Plaintiffs also urge the court to follow the D.C. Circuit's elaboration on the Supreme Court's IOAA rulings. *See* p. 515 *supra*.

There are significant differences between the IOAA and the Grain Standards Act, differences that render inapposite the type of narrowing construction suggested by plaintiffs. To begin with, the Standards Act is already drafted much more narrowly than the IOAA. The IOAA purports to authorize agencies to set fees based on a number of factors, many of them quite broad. *See* p. 515 *supra*. By contrast, sections 79 and 79a provide that the agency shall base its fees as nearly as practicable on the cost of providing services. Here, Congress has provided a clear and simple standard, one that is capable of relatively precise understanding and application. There is no possibility that the agency will set the fees on the basis of broad policy considerations normally reserved to Congress in levying taxes. As the Supreme Court has held, "[i]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Hampton & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928), *quoted with approval in NCTA*, 415 U.S. at 342, 94 S.Ct. at 1150; *see Amalgamated Meat Cutters & Butcher Workmen of North America v. Connally*, 337 F.Supp. 737, 746 (D.D.C.1971).

In addition, the Standards Act is a specific delegation of authority to a single agency to collect fees for very specific services. By contrast, the IOAA speaks in sweeping terms, delegating to all federal agencies the authority to charge for a wide variety of services, benefits, privileges, franchises, licenses, etc. The possibility is real that the IOAA, if not read narrowly, might result in large-scale collection of revenues by a multitude of agencies, usurping the responsibility of Congress to levy taxes. Moreover, a wholesale delegation of authority like that in the IOAA makes it difficult for Congress to predict how it will be exercised or to monitor abuses. By contrast, Congress carefully considered and delimited its delegation of authority to FGIS. *See, e.g.,* S.Rep. No. 747 at 35, 1976 U.S.Code Cong. & Ad.News at 6585–86. It regularly reviewed the agency's fee-setting activities through annual reports, *see, e.g.,* FGIS 1978 Annual Report 15 (1979); FGIS 1979 Annual Report 12 (1980), and appropriations hearings, *see, e.g., Agriculture and Related Agencies Appropriations for 1978: Hearings Before a Subcommittee of the House Committee on Appropriations,* 95th Cong., 1st Sess. pt. 5, at 1, 38 (1977) [hereinafter cited as *1978 Appropriations Hearings* ]; *Agriculture, Rural Development and Related Agencies Appropriations for 1980: Hearings Before a Subcommittee of the House Committee on Appropriations,* 96th Cong., 1st Sess. pt. 5, at 969, 977, 993 (1979); *Agriculture, Rural Development and Related Agencies Appropriations for 1981: Hearings Before a Subcommittee of the House Committee on Appropriations,* 96th Cong., 2d Sess. pt. 4, at 231, 242 (1980). And, on two occasions during the years here in question, it actually amended the Act's fee-setting provisions. Pub.L. No. 95–113, Title XVI, §§ 1602(a), (b), 91 Stat. 913, 1025 (1977); Pub.L. No. 97–35, Title I, §§ 155(1), (2), 95 Stat. 357, 371–72 (1981).

Finally, it is very significant that funds collected by FGIS are not used by the

government as general revenues (as are fees collected under the IOAA), but are retained by the agency to finance the services that generated them. The Court's principal concern in *NCTA* and *FPC* was to avoid the collection of a tax in the guise of a service charge. If fees charged under the IOAA exceed the cost of providing services, the excesses could well be considered a tax because they are deposited into the Treasury as miscellaneous receipts and used to defray the cost of government. In the words of the Supreme Court, the excess charges would "inure[ ] to the benefit of the public." *NCTA*, 415 U.S. at 343, 94 S.Ct. at 1150. Here, however, there is *no* possibility that any portion of the fees collected will find its way into the general Treasury or otherwise inure to the benefit of the public. If the agency collects fees that exceed the cost of the services it provides, such excesses may not be used for general governmental purposes. By law, all funds collected under sections 79 and 79a must be used for a single purpose: to provide FGIS services. There is significant support for the view that such an assessment "lacks essential elements of a tax." *Memphis Natural Gas Co. v. McCanless*, 183 Tenn. 635, 194 S.W.2d 476, 483, *cert. denied*, 329 U.S. 670, 67 S.Ct. 99, 91 L.Ed. 591 (1946) & authorities cited therein; *see* 84 C.J.S. *Taxation* § 1 (1954). In any case, the Standards Act neatly avoids the concerns expressed by the Supreme Court in *NCTA* and *FPC* by assuring that the fees collected do not inure to the benefit of the general public but are used entirely to provide services to the class that generated the fees in the first place.

The delegation of authority to FGIS to collect fees is valid as written and does not run afoul of the concerns expressed by the Supreme Court in *NCTA*. It therefore does not require the type of narrowing

construction given the IOAA by the D.C. Circuit in *NCTA II* and related cases.[3]

■ **2.** The question remains whether the fee schedules set by the agency comply with sections 79(j) and 79a(*l*) of the Grain Standards Act. Plaintiffs point to a number of circumstances that, in their view, establish FGIS acted outside the scope of its authority to collect fees: fees collected in certain years greatly exceeded the cost of providing services; fees collected from certain grain elevators exceeded the cost of providing services at those elevators; fees calculated by reference to the amount of grain inspected rather than the number of man-hours were discriminatory and failed to reflect costs; and fees set uniformly on a nationwide basis failed to reflect the differing costs of providing services at different locations. None of these practices, however, appear to exceed the agency's congressional grant of authority. *National Association of Greeting Card Publishers v. United States Postal Service*, 462 U.S. 810, ——, 103 S.Ct. 2717, 2725, 77 L.Ed.2d 195 (1983) ("[a]n agency's interpretation of its enabling statute must be upheld unless the interpretation is contrary to the statutory mandate or frustrates Congress' policy objectives"); *see Lichter v. United States*, 334 U.S. 742, 783, 68 S.Ct. 1294, 1315, 92 L.Ed. 1694 (1948); *Yakus v. United States*, 321 U.S. 414, 425, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944); *see also FPC*, 415 U.S. at 352, 94 S.Ct. at 1155 (Marshall, J., concurring & dissenting).

Sections 79(j) and 79a(*l*) of the Grain Standards Act provide that FGIS shall set fees that are "reasonable" and that cover "as nearly as practicable" the "estimated costs" incurred in inspecting and weighing grain. While the Act clearly delineates the categories of costs that the agency may recover through fees, it gives the agency

---

**3.** In any case, the court notes considerable skepticism as to the result reached in *NCTA II* and related cases. Nothing in the IOAA or in the opinions of the Supreme Court in *NCTA* and *FPC* requires the strained interpretation adopted by the D.C. Circuit. While the court's ruling renders a more detailed analysis of those cases unnecessary, it suffices to point out that under

the standard adopted by the D.C. Circuit there is considerable uncertainty that *any* nationwide fee could survive, raising doubt about the validity of the first-class postage stamp, court filing fees, charges for use of national parks, and other such fees that do not bear a direct relationship to the cost of the services provided each recipient.

broad leeway in how precisely those fees must reflect costs. Fees need not be set on the basis of actual experience; estimates are sufficient. Moreover, the fees collected need not exactly match the estimates; they must come only as close as practicable. Quite clearly, the statute does not require perfection, merely best efforts.

The latitude afforded the agency under these sections reflects a congressional understanding that setting fees would involve significant uncertainty, particularly at first. The agency was established on January 1, 1977, and was given 18 months to take over the huge task of weighing and inspecting all export grain, a task previously performed by over 100 separate organizations at some 180 sites. Congress was well aware that the task would be difficult and that the agency would need a period of adjustment.[4] *See, e.g.,* H.R. No. 966, 94th Cong., 2d Sess. 44–45, 48 (1976) (acknowledging difficulty in accurately estimating costs where underlying data uncertain); *1978 Appropriations Hearings* at 38. The principal congressional concern in passing the Standards Act's fee provisions was to assure that the services provided would be self-supporting, i.e. that the cost would be borne by the industry profiting from the services and not by the taxpayers. *See* S.Rep. No. 747 at 13, 28, 1976 U.S.Code Cong. & Ad.News at 6532, 6546. There is no indication in either the statute or its legislative history that Congress meant the fees to be so precisely tailored that no elevator operator would ever be required to pay more than the exact cost of the services provided to it.

Under these circumstances, the court must exercise much deference in judging whether the fees set by the agency were appropriate. *See Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of*

*Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); *Lichter,* 334 U.S. at 785, 68 S.Ct. at 1316 ("[s]tandards prescribed by Congress are to be read in the light of the conditions to which they are to be applied"); *Crawford v. United States,* 376 F.2d 266, 179 Ct.Cl. 128, 142–43 (1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968). Of course, if the agency had continually overcharged for its services, accumulating a substantial reserve over a sustained period, there might have been an abuse of discretion. *See D.E. Foote & Co. v. Stanley,* 232 U.S. 494, 504, 34 S.Ct. 377, 379, 58 L.Ed. 698 (1914); *see also Bourjois, Inc. v. Chapman,* 301 U.S. 183, 187–88, 57 S.Ct. 691, 694–95, 81 L.Ed. 1027 (1937); *Pure Oil v. Minnesota,* 248 U.S. 158, 161–64, 39 S.Ct. 35, 36–38, 63 L.Ed. 180 (1918). This was not the case here. FGIS fees were regularly revised. *See* pp. 513–14 *supra.* While agency revenues from inspection and weighing exceeded costs at one point, the fees were adjusted downward and the accumulated reserves were used to subsidize services in later years. It is not without significance that appropriated funds were also used to lower the cost of the services provided plaintiffs. In fact, over the years the services provided to plaintiffs and other members of their industry have been subsidized to the tune of some $3.3 million. *See* p. 514 *supra.*

■ Nor is there any merit to plaintiffs' argument that the agency's use of uniform nationwide fees or a unit fee structure was improper. Congress considered giving FGIS specific instructions for setting fees but decided against it. *See* S.Rep. No. 747 at 35, 1976 U.S.Code Cong. & Ad.News at 6585. When Congress amended the statute in September 1977 (after nationwide fees had been in effect for nine months) and again in 1981, it did nothing to alter the

---

4. Indeed, the agency encountered any number of unforeseen problems. There was, for example, an unexpected increase in grain sales to the Soviet Union. Further, in February 1978 the agency was unexpectedly required to take over operations that had previously been delegated to

the State of Oregon pursuant to 7 U.S.C. §§ 79(e)(2), 79a(c)(2). These two factors alone resulted in the inspection of almost half a billion bushels of grain more than the number anticipated in fee projections for that year.

agency's fee structure. This bespeaks congressional acquiescence in the agency's fee-setting practices. *See Power Reactor Co.,* 367 U.S. at 409, 81 S.Ct. at 1535; *Acker v. United States,* 620 F.2d 802, 223 Ct.Cl. 281, 290 (1980); *Crawford,* 376 F.2d 266, 179 Ct.Cl. at 143.

■ Plaintiffs further claim that FGIS fees violated the Standards Act as amended in 1977 (to preclude the agency from recovering supervisory and administrative expenses) because the agency failed to issue a new fee schedule at that time. This claim is without merit because the agency did not have to pass the cost savings on to the elevator operators at once. In response to the 1977 amendments, the agency issued an internal notice instructing agency personnel to discontinue charging supervisory time to fee-supported accounts. *See* FGIS Notice 45. The agency thereby assured that supervisory activities would be paid out of appropriated funds, effectively increasing the size of the reserve available to subsidize weighing and inspection fees in later periods. *See* pp. 513–14 *supra*; p. 523 n. 13 *infra*. Given that FGIS fees during this period were based on estimates in any case, the court considers the agency's response to have been appropriate.

■ Plaintiffs' final substantive claim, that an intra-agency directive—Notice 202—violated the Standards Act, is also without merit. That notice, issued in November 1979, provided further instructions to agency personnel on how to charge their time. Plaintiffs challenge the notice because it instructed FGIS clerical staff involved in supervisory support activities to charge their time to fee-supported accounts rather than to appropriation-supported accounts. Plaintiffs argue that this instruc-

tion contravenes the language of the statute which, between October 1, 1977, and September 30, 1981, precluded the agency from charging supervisory time to fee-supported accounts. In effect, plaintiffs are arguing that clerical personnel assisting supervisors were themselves performing supervisory functions and that the agency could not classify them otherwise.

The court disagrees. While the agency might well have been justified in treating supervisory support activities as supervisory, it was certainly not required to do so. There is no clear dividing line between those activities that are supervisory and those that are not. The agency was required to implement the statutory language, and that implementation called for the exercise of judgment and discretion. *See, e.g., Nabisco, Inc. v. United States,* 599 F.2d 415, 220 Ct.Cl. 332, 340–41 (1979); *Port Authority of Saint Paul v. United States,* 193 Ct.Cl. 108, 116 (1970). Given the deference due the agency under such circumstances, *Udall v. Tallman,* 380 U.S. at 16, 85 S.Ct. at 801; *Alexander v. United States,* 1 Cl.Ct. 653, 657 (1983), the court cannot say that the agency abused its discretion by refusing to treat clerical staff performing clerical functions as supervisors.[5]

## II. Procedural Objections

A. Plaintiffs' most significant procedural claim is that the unit fee schedules for grain inspection in effect from January 9, 1978, until December 2, 1979, are invalid because of the agency's failure to follow the APA's notice and comment procedures. 5 U.S.C. §§ 553(b), (c) (1982). Defendant has conceded the applicability of the APA and the agency's failure to comply with it, but asserts the defense of laches.[6]

---

**5.** Plaintiffs additionally claim that the agency violated the Standards Act in 1980 when it reallocated to fee-supported accounts certain expenses previously charged to appropriation-supported accounts. The court finds as little merit in this argument as in plaintiffs' Notice 202 claim and rejects it for the same reasons.

**6.** No explanation is offered by defendant for this blatant failure to follow the clearly applicable procedures imposed by Congress. While there is no basis for inferring bad faith, such negligence on the part of the agency in complying with legal requirements is entirely inexcusable. The court is mindful of the time pressures under which the agency was operating; it cannot, however, approve of what appears to have

■ The defense of laches rests on two elements: inexcusable or excessive delay on the part of the plaintiff and prejudice to the defendant resulting therefrom. *See, e.g., Fleming v. United States,* 2 Cl.Ct. 111, 115 (1983).[7] That plaintiffs have excessively delayed in raising their APA notice and comment argument is plain. The agency announced the January 1978 fee schedule in the *Federal Register* of December 8, 1977. That announcement clearly advised the industry of the manner in which the new fees would be calculated, and even went so far as to expressly (albeit incorrectly) claim exemption from notice and comment procedures. 42 Fed.Reg. 61,987, 61,988 (1977). Any dispute plaintiffs had with the agency's decision not to follow those procedures could have been voiced as early as December 1977. Plaintiffs could have notified the agency of their concern or even brought an action under the APA to enjoin implementation of the new fee schedule. 5 U.S.C. § 702 (1982). The record reflects no efforts by plaintiffs to bring this issue to the agency's attention in a timely fashion. Indeed, it was not until 1980 that one of the plaintiffs first wrote to the agency to request a refund of fees paid under the January 1978 fee schedule.

Plaintiffs attempt to justify this delay by arguing that they did not learn until March 1980 (following the agency's response to an industry request for information) the degree to which they had suffered as a result of the unit fee schedules.[8] This argument is entirely beside the point. The notice and comment procedures of the APA safeguard the public's right to offer input into agency decision making, *American Standard, Inc. v. United States,* 602 F.2d 256, 220 Ct.Cl. 411, 427 (1979); they do not guarantee a more favorable substantive result. Failure by the agency to follow the requirements of the APA deprived plaintiffs of their right to comment on the proposed fees; the nature and extent of that deprivation should have been known to plaintiffs as soon as they read the December 8, 1977, *Federal Register* notice. Whether the fee schedule turned out to overcharge plaintiffs a little, a lot or not at all, has no bearing on whether they were deprived of their procedural right to participate in the fee-setting process.

The second element of laches, harm to the defendant because of the delay, is also established. In December 1978 (a full year after it promulgated the offending fee schedule) defendant began a program of lowering its charges in order to bleed off accumulated reserves; this program continued for the period here in question,[9] and resulted in operating losses in FY 1980 and 1981. Had plaintiffs raised their objection to the January 1978 fee schedule promptly, implementation of that schedule might have been delayed or averted. Even if the objection had been raised after the fee schedule went into effect, the agency could have postponed distribution of accumulated reserves while the matter was in dispute. *Cf. National Association of Broadcasters v. FCC,* 554 F.2d at 1128 n. 27 (fees collect-

---

been gross dereliction of duty on the part of agency officials and of the attorneys paid to ensure agency compliance with the law.

7. Although most frequently applied in pay cases, the defense of laches has been applied in cases alleging violations of the APA, *see, e.g., Triangle Improvement Council v. Ritchie,* 314 F.Supp. 20, 25 (S.D.W.Va.1969), *aff'd,* 429 F.2d 423 (4th Cir. 1970); *Haas v. Overholser,* 223 F.2d 314, 315 (D.C.Cir.1955); in patent infringement actions, *see Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 741 (Fed.Cir.1984); and considered in an IOAA fee refund suit, *see National Ass'n of Broadcasters v. FCC,* 554 F.2d 1118, 1128 & n. 27 (D.C.Cir.1976).

8. The court notes, however, that plaintiffs could have obtained the relevant information under FOIA much earlier. Further, the record discloses that by mid-1979 one of the plaintiffs was well aware of the adverse economic impact of the unit fees.

9. In December 1978 inspection fees were reduced by 12.5% and weighing fees by 20%. In July 1979, the agency established a two-hour grace period for standby inspection fees. In December 1979, the grace period was eliminated, but hourly inspection fees were reinstituted and the fees were lowered. Both inspection and weighing fees were increased in January of 1981 to slow the rate of loss, but were again reduced in May 1981.

ed under contested fee schedule placed in suspense account pending outcome of litigation). As it was, defendant acted not only to its detriment but to the benefit of the industry by providing services at less than cost for a number of years. Invocation of the equitable doctrine of laches to bar plaintiffs' claim is therefore entirely appropriate.[10]

**B.** Plaintiffs also assert that certain of the agency's fee schedules in effect from October 1, 1977, to September 30, 1981, are invalid as arbitrary and capricious because the agency considered irrelevant or improper factors when setting its fees. These factors were comparative cost data from state inspection programs and certain intra-agency revenue data that turned out to be erroneous.[11]

■■■ The scope of judicial review under the APA is narrow. It is not the court's function to determine whether it agrees with the agency's decision but only to determine whether the decision was based on irrelevant factors, whether it lacks a rational basis or whether it represents a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The agency's decision must be accorded substantial deference. *Minority Business Legal Defense & Education Fund, Inc. v. Small Business Administration,* 557 F.Supp. 37, 41 (D.D. C.1982). Where the agency must address and resolve novel issues in reaching its decision, an even greater degree of deference is appropriate. *American Public Gas Association v. FPC,* 567 F.2d 1016, 1031

(D.C.Cir.), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

■■■ As previously noted, the Standards Act allows the agency significant leeway in setting fees. *See* pp. 518–19 *supra.* The statute authorizes the agency to estimate, as best it can, the cost of providing services, and to set its fees insofar as practicable to recover that estimated cost. How estimates were to be derived, and the extent to which it would be practicable to tailor the fee schedules to those estimates, was left to the agency's discretion. As a newly created agency with no cost data of its own, FGIS appears to have acted rationally in looking to the cost data of state agencies that had been performing inspections for years. There is no indication that FGIS gave this data controlling weight, only that it considered it in making its own estimates. Far from an abuse of discretion, this appears to have been an entirely reasonable way for the agency to proceed.

Nor did the agency abuse its discretion by considering FY 1978 and 1979 cost data that turn out to have been flawed. Agencies frequently must act on the basis of facts or data that are uncertain. So long as the agency relies on the data in good faith and ceases reliance once it discovers an error, there is no abuse of discretion. *Cf. American Petroleum Institute v. Costle,* 665 F.2d 1176, 1185 (D.C.Cir.1981) (administrator's partial reliance on data acknowledged to be uncertain not an abuse of discretion), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982). Here, the agency was faced with the monumental task of setting up and operating a nationwide network of weighing and inspection stations in a relatively short time. Congress was aware that problems would arise and that adjustments would have to be

---

**10.** Plaintiffs make an additional notice and comment claim that, even where proper procedures were followed, no meaningful notice or comment was possible due to the agency's failure to publish cost and revenue data as required under cases interpreting the IOAA. *See Electronic Industries Ass'n,* 554 F.2d at 1117. Because the IOAA does not apply to this case, the court finds plaintiffs' argument without merit. *See* pp. 516–17 *supra.*

**11.** Plaintiffs include in their list of irrelevant factors the agency's consideration of supervisory and administrative costs in periods when such costs were to be excluded. There is no indication that such costs were included in the agency's fee-setting calculations. *See* pp. 519–20 *supra.*

made. *See* p. 518 *supra.* It therefore allowed the agency substantial discretion in carrying out its responsibilities.[12] That discretion was not abused.[13]

■ C. Plaintiffs' final procedural argument asserts two violations of the Freedom of Information Act, 5 U.S.C. § 552(a)(1)(D) (1982). That section requires an agency to publish in the *Federal Register* all "substantive rules of general applicability ... and statements of general policy or interpretations of general applicability formulated and adopted by the agency." Plaintiffs first allege that sometime during 1978 the agency changed its policy as to the size of the reserve it would maintain, increasing the amount from some $500,000 (a two-week reserve) to some $4,500,000 (a six-month reserve). Plaintiffs argue that the agency's decision to increase the reserve caused fees to be higher than they would have been had the agency maintained its original policy. Plaintiffs' second allegation is that Notice 202, even if valid, *see* pp. 519–20 *supra,* increased the number of hours charged to fee-supported accounts, resulting in higher fees. According to plaintiffs, the agency's failure to publish the six-month reserve policy and Notice 202 renders these policies void. Plaintiffs argue that they are therefore entitled to a refund of that portion of the fees that reflected those two policies.[14]

■ Plaintiffs misconstrue the statute. Section 552(a)(1)(D) requires publication of rules, policies and procedures that govern an agency's dealings with the public or the conduct of private parties that is subject to regulation by the agency. The section quite sensibly precludes agencies from subjecting private parties to standards of conduct or rules of procedure of which they are not given notice. *See, e.g., St. Elizabeth's Hospital v. United States,* 558 F.2d 8, 214 Ct.Cl. 322, 328–29 (1977) (unpublished rule establishing two-year period within which to change method of depreciation held unenforceable where published regulations implied a ten-year period). However, courts have consistently held that "the requirement for publication attaches only to matters which *if not published* would adversely affect a member of the public," *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir.1970) (emphasis added), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971), or "which affect the steps a party must take to present a matter to the agency," *Chevron Oil Co. v. Andrus,* 588 F.2d 1383, 1388 n. 8 (5th Cir.), *cert. denied,* 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 108 (1979). *Accord Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, 1405 (Temp.Emer.Ct.App.1975); *United States v. De Vaughn,* 414 F.Supp. 774, 782 (D.Md.1976), *aff'd,* 556 F.2d 575 (4th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). In other words, the Freedom of Information Act requires publication of those policies of which the public must be aware in order to conform its conduct to the agency's requirements.

When the matter in issue involves a policy that is entirely internal to the agency and that, of itself, does not affect the conduct of private parties, publication is not required by section 552(a)(1)(D). *See, e.g.,*

---

**12.** The legislative history of the Grain Standards Act discloses acute congressional alarm at the massive corruption it discovered at export grain elevators in places such as Destrehan, Louisiana, where these plaintiffs do business. S.Rep. No. 747 at 35–46, 1976 U.S.Code Cong. & Ad. News at 6552–63. One plaintiff was prominently mentioned in testimony. S.Rep. No. 747 at 42–45, 1976 U.S.Code Cong. & Ad.News at 6559–62. While this would not excuse any wrongdoing or abuse of discretion on the part of the agency, it does explain why Congress was in such a hurry and why it gave the agency a relatively free hand in determining how the fees would be set.

**13.** In any case, it must be remembered that all fees collected by the agency were placed into a revolving fund used to support the same services in the future. *See* pp. 513, 517 *supra.* This would render harmless any error that might have been committed in setting fees.

**14.** Leaving no stone unturned, plaintiffs claim that the 1980 cost reallocations, *see* p. 520 n. 5 *supra,* also required publication under FOIA. Appropriately enough, little was made of this argument and, for the reasons discussed in the text, the court finds it to be without merit.

**524**

*Pesikoff v. Secretary of Labor,* 501 F.2d 757, 763–64 n. 12 (D.C.Cir.) ("[plaintiff] would have stood in no better stead if he had had notice"), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974). Indeed, there are a multitude of policies, practices, guidelines, customs and preferences that affect to a greater or lesser extent the way agencies conduct their internal affairs. Sometimes these are adopted by express policy; more often, they are the product of accretion, their source or genesis uncertain. Individually and as a group these bureaucratic pathways can have a substantial effect on an agency's decision-making process. It would make no sense whatsoever—if it were even possible—to require agencies to publish each of them in the *Federal Register.* To do so would place an entirely unwarranted burden upon the ever-evolving process of internal agency practice.[15]

Neither the agency's decision to change the level of its operating reserve nor its Notice 202 required publication under FOIA. These plaintiffs were fully aware of the fees they were required to pay for grain weighing and inspection. The method by which the agency set the fees might well have been of interest to plaintiffs (in which case they might have discovered the information through a Freedom of Information Act request) but it had no bearing on their conduct or on their dealings with the agency. Because the agency was not required to publish either the change in policy as to the size of the operating reserve or Notice 202, the resulting fee schedules were not defective and plaintiffs' claim must fail.[16]

### Conclusion

Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaints with costs to the prevailing party. 28 U.S.C. § 2412(a) (1982); RUSCC 54(d).

---

**15.** The statute itself reinforces this conclusion by providing in section 552(a)(2) that certain documents and records need only be made available for inspection by the public.

---

**16.** Since Notice 202 did not have to be published under 5 U.S.C. § 552(a)(1)(D), it follows a fortiori that it was not subject to notice and comment rulemaking under the APA.